### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### PINCUS BROTHERS, INC.–MAXWELL, Respondent.

No. 79–1690.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1980.

Decided April 17, 1980.

As amended June 12, 1980.

---

Susan L. Williams (Argued), John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen., Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for N. L. R. B.

Robert E. Wachs (Argued), Phillip E. Garber, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Pincus Bros., Inc.-Maxwell.

Before GIBBONS, ROSENN, and GARTH, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Statutory policy of the Labor Management Relations Act (the Act), 29 U.S.C. § 173(d) (1976), encourages the use of the grievance and arbitral machinery for the settlement of disputes agreed upon by the parties to a collective bargaining agreement. The dominant issue raised by this

petition of the National Labor Relations Board (the Board) for enforcement of its order is whether the Board committed error in declining to defer to an arbitration award which determined that the employer had discharged an employee for just cause. We conclude that the Board abused its discretion in refusing to defer to the arbitration award and therefore deny enforcement of the Board's order.

## I.

Pincus Brothers, Inc.-Maxwell (Pincus Brothers or the Company) is a Philadelphia manufacturer and wholesale distributor of men's clothing. Its employees are represented by the Philadelphia Joint Board, Amalgamated Clothing Workers of America (the Union). Jane Richardson was employed in the sleeve department of the plant from December 5, 1975, until her discharge on February 18, 1977.

On several occasions during her employment Richardson left her work station to converse with other employees and was di-

rected by her supervisor not to waste time. In October 1976, when there was insufficient work to keep all the sleeve department employees working a 40-hour week, several employees and the union business agent asked Company President, Irwin N. Pincus, to lay off Richardson, the least senior member of the department. At the time, Pincus refused.

On February 15, 1977, the Company and the Union held their semi-annual plant meeting with employees and union representatives during which employee complaints and suggestions were discussed. Pincus spoke about general company developments, including certain style changes. Several sleeve setters questioned Pincus as to whether the piece rate would be changed as a result of the style changes.[1] Pincus responded that more flexibility would be required.

Following the meeting Richardson prepared a one-page leaflet entitled "WE WON'T SACRIFICE FOR PINCUS' PROFITS."[2] The leaflet called the plant meet-

1. The Company's sleeve setters were paid on a piece rate, averaging 25 coats an hour with a resultant hourly wage of $5.50. The arbitrator found this wage to be above average in the industry.

2. The leaflet stated:

WE WON'T SACRIFICE
FOR PINCUS' PROFITS!

Last Tuesday, we were called to a "family gathering" by the Big Four for some special announcements. Serving as Master of Ceremonies for this circus was John DeMee, our Business Agent. He quickly gave the spotlight to Pincus, who sang "Happy Days Are Here Again" (for him), telling us that profits are soaring, the business is expanding, things are better than ever. He told us again that we're a great bunch, we do good work, and thanks for making us GREAT, patting us on the back before he laid down the law.

What was the special occasion that called for those speeches anyway? Valentine's Day? No way! Lately a lot of us on different operations have seen that we need a better price, like on double-breasted coats or plaids that have to be matched or saddlestiching for trim or bulkier shoulder pads. So we went to the office to fight for that new price. And we weren't going to wait for the contract in June. We need the better rates now.

So Pincus tells us that we gotta keep up with the styles, we have to offer "our customers" variety and that we gotta be FLEXIBLE on the different styles. He says there's gotta be a real need if we're going to get the prices raised. Well, as far as he's concerned, what we NEED is only what it takes to get us to work the next day. And being FLEXIBLE means more bucks for him and another slice off our already stinking paychecks. Before you know it, he'll have us making overcoats in the vest dept. (just a style change, you know) . . . !

Well, forget it! When we get a cut, we can't tell the cashier at the ACME or the landlord or the insurance company that we got a pay cut, 'cause the bills are still the same.

Pincus tells us this is the best shop in the city. What a smoke job! The way we have to work ain't no different from any other stinking garment shop in this city.

It's an insult that he thought we'd fall for that bit about the family. Forget it. Nat, we aren't the dumb animals you think we are. 'Cause you're the boss and we're the ones that make you rich. And, when we need more money, we're gonna fight for it, whatever lousy style of clothes we're making.

THE GARMENT WORKER

Join the Garment Worker—Build a fighting organization of garment workers, contact us at: 783—4242

Labor donated

ing a "circus" and characterized Pincus' call for flexibility as effectuating "pay cuts" to "our already stinking pay checks." The leaflet further stated that "[t]he way we have to work ain't no different from any other stinking garment shop in this city" and referred to the "lousy style of clothes" Pincus was making.

On February 18, 1977, Richardson brought copies of the leaflet to the plant and prior to the 8 A.M. starting time placed some in the women's restroom. She also gave a stack of the leaflets to another employee, Joe Ferraro, and asked him to place them in the men's restroom. After reading one leaflet, Ferraro tore up the stack he had been given. Richardson also handed out leaflets elsewhere in the plant until approximately 8:05 A.M. About 8:15 A.M. Pincus was informed of the leafletting by Plant Manager, Peter Matazzo. According to Matazzo, production was disrupted on the work floor because of employees' reading the leaflet. At approximately 1:40 P.M. that day, Pincus instructed Matazzo to discharge Richardson. Matazzo called Richardson and the union shop chairman into his office. After an initial denial, Richardson admitted distributing the leaflet. Matazzo discharged her without further questions or discussion.

Soon after the discharge the Union filed a grievance on behalf of Richardson which, under the collective bargaining agreement, terminated in arbitration. On April 12, 1977, the arbitrator [3] rendered his decision, concluding that the discharge was for cause because Richardson had (1) abused working time, and (2) written a handbill which she distributed during both working and nonworking time which "intentionally misrepresented or distorted facts related to certain

employment practices and to certain business policies and product status of the Company in a denigrating, disparaging fashion so as to constitute detrimental unprotected disloyalty."

While the grievance was pending, Richardson filed a charge on February 24, 1977, with the Board alleging that Pincus Brothers violated section 8(a)(1) of the Act [4] by discharging her because she engaged in concerted activities. The General Counsel issued a complaint and agreed with the Company to waive a decision by an Administrative Law Judge (ALJ) and submit to the Board the question of whether the Board should defer to the arbitrator's award. The Board delegated its authority to a three-member panel pursuant to section 3(b) of the Act. [5] The panel relied on the facts as found by the arbitrator and concluded it would not defer because Richardson engaged in protected activity and her discharge violated section 8(a)(1), 237 N.L.R.B. No. 159. The Board thereupon remanded the case to an ALJ for a hearing. He found that Pincus committed an unfair labor practice in discharging Richardson and ordered the Company to reinstate her. In a Supplemental Decision and Order of April 9, 1979, the Board adopted the ALJ's findings and conclusions. The Board then commenced this action for enforcement of its order. [6]

The Board recognized that the applicable standard for its deference to arbitral awards was the standard enunciated in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955). In *Spielberg*, the Board stated that it would defer to the arbitrator's award where (1) the proceedings have been fair and regular; (2) the parties agreed to be bound; and (3) the decision is not "clear-

3. The arbitrator was the late I. Herman Stern, a Professor of Labor Law at Temple University.

4. Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976) provides:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [Section 7 of the Act;

5. 29 U.S.C. § 153(b) (1976).

6. Section 10(e) of the Act, 29 U.S.C. § 160(e) (1976), grants the NLRB the authority to petition the Court of Appeals for the circuit within which the unfair labor practice occurred for enforcement of its order.

ly repugnant" to the purposes and policies of the Act. In this case, the parties agree that the proceedings were fair and regular and that the parties agreed to be bound by arbitration.[7] The Board concluded that the findings of the arbitrator were "clearly repugnant" to the Act and declined to defer. Thus, the determinative issue in this enforcement petition is whether the Board erred in concluding that the arbitration award was "clearly repugnant" to the Act.

## II.

■ The first issue we must resolve is this court's standard of review of the Board's refusal to defer to the arbitration award. The company urges that we review the Board's refusal to defer as a matter of law while the Board claims the substantial evidence rule is applicable. It is our duty to insure that the Board adheres to its established criteria unless it clearly decides to modify or alter those standards. We, therefore, adhere to the prevailing view that the decision of the Board in refusing to defer will be overturned only if the Board has abused its discretion.[8] *Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674, 676 (9th Cir.), *cert. denied*, 431 U.S. 965, 97 S.Ct.

2921, 53 L.Ed.2d 1061 (1976); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2d Cir. 1971).[9]

We turn now to the merits of the Board's order. The *Spielberg* doctrine evolved as a means of accommodating the national policy in favor of the private resolution of labor disputes through consensual arbitration.[10] That policy finds expression in Section 203(d) of the Act, 29 U.S.C. § 173(d) (1976), which declares: "Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." As more fully explained in *International Harvester Co.*, 138 N.L.R.B. 923 (1962), the source of the Board's deferral policy is rooted in both congressional and Supreme Court pronouncements.

The Act, as has repeatedly been stated, is primarily designed to promote industrial peace and stability by encouraging the practice and procedure of collective bargaining. Experience has demonstrated that collective-bargaining agreements that provide for final and binding arbitration of grievance and disputes arising

7. In *Raytheon Co.*, 140 N.L.R.B. 883 (1963), *enforcement denied on other grounds*, 326 F.2d 471 (1st Cir. 1964), the Board added a requirement to *Spielberg* that the arbitrator must have considered the unfair labor practice issue and ruled on it. It is clear from the arbitration decision in this case that the arbitrator complied with this requirement and neither party argues otherwise. *See generally Banyard v. NLRB*, 164 U.S.App.D.C. 235, 505 F.2d 342, 347 (D.C.Cir. 1974), where another circuit has added the requirements that the issue must have been "clearly decided" and within the competence of the arbitrator. *See also* 88 Harv.L. Rev. 804 (1975), discussing *Banyard*.

8. Judge Garth, in concurrence, urges that we review the actions of the Board under an error of law standard. I do not agree with that position because I believe that *Spielberg* is a discretionary administrative doctrine and not the law of Board deferral. A law originates from the constitutional grant of congressional and judicial power and the delegation of that power. There is no indication that the Board was acting pursuant to any delegated rulemaking authority in *Spielberg*. On the contrary, the Board's statement in *Spielberg* that it was deferring to the arbitration award because it

believed "that the desirable objective of encouraging the voluntary settlement of labor disputes will best be served by recognition of the arbitrator's award," *Spielberg Mfg. Co., supra*, 112 N.L.R.B. at 1082, indicates that the Board was exercising discretion. *See Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009 at 1014 (3d Cir. 1980). Because I believe the Board was exercising its discretion, I conclude its failure to defer can only be reversed for an abuse of that discretion.

9. *See also Alfred M. Lewis, Inc. v. NLRB*, 587 F.2d 403, 407 (9th Cir. 1978); *Local 700, Machinists Union v. NLRB*, 525 F.2d 237, 244 (2d Cir. 1975); *Associated Press v. NLRB*, 492 F.2d 662, 666 (D.C.Cir. 1974); *NLRB v. Auburn Rubber Co.*, 384 F.2d 1, 3 (10th Cir. 1967).

10. In *Boys Market, Inc. v. Retail Clerks*, 398 U.S. 235, 252, 90 S.Ct. 1583, 1593, 26 L.Ed.2d 199 (1970), the Supreme Court iterated its approval of the arbitral process characterizing it as "the central institution in the administration of collective bargaining contracts."

thereunder, "as a substitute for industrial strife," contribute significantly to the attainment of this statutory objective. . . .

Recognizing arbitration as an instrument of national labor policy for composing contractual differences, which it found imbedded in the [Act] and other Federal legislation and sources, the Supreme Court of the United States has given this policy meaningful substance. . . . So important a role did the Court regard arbitration as playing in the national labor scheme as "a stabilizing influence" that the Court in later cases cautioned the lower courts in Section 301 suits to refrain from passing on the merits of the grievances under the guise of determining the question of arbitrability, but to construe contractual arbitration provisions expansively if "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration" is to be realized.

If complete effectuation of the Federal policy is to be achieved, we firmly believe that the Board, which is entrusted with the administration of one of the many facets of national labor policy, should give hospitable acceptance to the arbitral process as "part and parcel of the collective bargaining process itself," and voluntarily withhold its undoubted authority to adjudicate alleged unfair labor practice charges involving the same subject matter, unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act.[11]
*Id.* at 926–27 (footnotes omitted).

In *Collyer Insulated Wire*, 192 N.L.R.B. 837, 842 (1971), the Board applied *Spielberg* to require deferral when "[t]he contract and its meaning . . . lie at the center of [the] dispute."[12] The Board explained its rationale as follows:

We are not compelling any party to agree to arbitrate disputes arising during a contract term, but are merely giving full effect to their own voluntary agreements to submit all such disputes to arbitration, rather than permitting such agreements to be side-stepped and permitting the substitution of our processes, a forum not contemplated by their own agreement.

Nor are we "stripping" any party of "statutory rights." The courts have long recognized that an industrial relations dispute may involve conduct which, at least arguably, may contravene both the collective agreement and our statute. When the parties have contractually committed themselves to mutually agreeable procedures for resolving their disputes during the period of the contract, we are of the view that those procedures should be afforded full opportunity to function.
*Id.* at 842–43.

This court has dealt with the similar issue of *judicial* deference to arbitration awards in the context of suits under Section 301.[13] In *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969), this court recognized "the strong public policy of encouraging the peaceful settlement of indus-

---

**11.** Some of the above language was quoted with approval by the Supreme Court in *Carey v. Westinghouse Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1974).

**12.** There is some debate as to whether *Collyer* evolved from *Spielberg* or whether it was a new, and broader, doctrine. *See generally* Murphy and Sterlacci, *A Review of the National Labor Relations Board's Deferral Policy*, 42 Ford.L.Rev. 291 (1973); Note, *Deference of Jurisdiction by the National Labor Relations Board and the Arbitration Clause*, 25 Vand.L.Rev. 1057 (1972).

**13.** Section 301(a) of the Act, 29 U.S.C. § 185(a) (1973) provides:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

trial disputes by means of the device of arbitration." Accordingly, we stated:

> At the very least this means that the interpretation of labor arbitrators must not be disturbed so long as they are not in "manifest disregard" of the law, and that "whether the arbitrators misconstrued a contract" does not open the award to judicial review.[14]

*Id.* at 1128 (footnotes omitted). *See also Acme Markets, Inc. v. Local 6, Bakery & Confectionery Workers International Union,* 613 F.2d 485 (3d Cir. 1980).

■ As a result of both judicial and Board deference to arbitration awards, an arbitral result could be sustained which is only arguably correct and which would be decided differently in a trial *de novo.* The national policy in favor of labor arbitration recognizes that the societal rewards of arbitration outweigh a need for uniformity of result or a correct resolution of the dispute in every case. The parties are not injured by deference to arbitration because it is the parties themselves who have selected and agreed to be bound by the arbitration process. To the extent that the parties surrender their right to a subsequent full hearing before the Board or a court, it is a voluntary waiver, consistent with the national policy.[15]

■ Based on the Board's *Spielberg* doctrine, congressional action, and judicial decisions of the Supreme Court as well as this circuit, we conclude that it is an abuse of discretion for the Board to refuse to defer to an arbitration award where the findings of the arbitrator may arguably be characterized as not inconsistent with Board policy.[16] In other words, "[i]f the reasoning behind an award is susceptible of two interpretations, one permissible and one impermissible, it is simply not true that the award was 'clearly repugnant' to the Act." *Douglas Aircraft Co. v. NLRB,* 609 F.2d 352, 354 (9th Cir. 1979).

■ Deference by the Board to the arbitration process, especially when the award has already been rendered and it is arguably consistent with Board policy, will effectuate the intent of the parties in the collective bargaining agreement and avoid the time, expense, and inconvenience of duplicative proceedings.[17] The parties accepted the risk that arbitration results could differ from Board decisions when they elected to proceed by arbitration and the

---

14. This court's policy of deferral to arbitration awards follows from the holdings of a line of Supreme Court cases commonly referred to as the *Steelworkers Trilogy. United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). *See generally* Comment, *Employee Challenges to Arbitral Awards: A Model for Protecting Individual Rights* under the Collective Bargaining Agreement, 125 U.Pa.L.Rev. 1310 (1977).

15. In *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 54–60, 94 S.Ct. 1011, 1022–25, 39 L.Ed.2d 147 (1974), the Court distinguished between rights "conferred on employees collectively to foster the processes of bargaining" which may be waived by the union in order to gain economic benefits and non-majoritarian rights, such as those under Title VII, which cannot be waived. The subject of the arbitration in this case concerns waivable individual collective bargaining rights. *See* 88 Harv.L. Rev. at 809.

16. The Board seemed to acknowledge this standard of deferral in its opinion in this case when it stated:

> We recognize that in some cases there may be reasonable disagreement as to whether or not [an employee's activity is protected]. . . . In such cases we will not refuse to defer to the arbitrator's award simply because we would have reached a different result.

237 N.L.R.B. No. 159 at 4.

17. As we have already alluded, the Board in *International Harvester, supra,* interpreted the *Spielberg* doctrine stating it would refuse to adjudicate unfair labor practice claims arising from the same facts as an arbitrated contract dispute unless the arbitration proceedings were "tainted by fraud, collusion, unfairness, or serious procedural irregularities or . . . the award was clearly repugnant to the purposes and policies of the Act." *Id.* at 927. The Board commented on its "clearly repugnant" test stating an arbitrator's conclusions on questions of law would stand unless they were "palpably wrong." *Id.* at 929.

Board recognized such possibilities when it adopted the policy to defer to an arbitrator's award. However, when the arbitration award cannot be arguably reconciled with the policies of the Act, the Board will vindicate the federal interest by declining to defer.[18]

### III.

■ In this case the arbitrator found that Richardson was terminated for "cause" because she abused working time and wrote and distributed the leaflet. The Board concluded that Richardson's leafletting activity was protected by section 7 of the Act and declined to defer. We hold that the Board abused its discretion in refusing to defer to the arbitration award because Richardson's leafletting was arguably unprotected activity and therefore not "clearly repugnant" to the Act.

The Board relied exclusively on the facts as found by the arbitrator in concluding that Richardson was engaged in protected activity.[19] It reexamined the language of the leaflet which the arbitrator characterized as "detrimental unprotected disloyalty" and concluded that "[t]he expression by employees of their opinions as to working conditions, whether done in colorful speech, as here, or in more formal terms, is a fundamental right under Section 7 of the Act." 237 N.L.R.B. No. 159 at 8.

■ We believe there are several reasons why Richardson's activities were arguably unprotected. First, an employee loses the protection of the Act where his or her statements are "deliberately or maliciously false." *Texaco, Inc. v. NLRB*, 462 F.2d 812 (3d Cir.), *cert. denied* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 302 (1972).[20] Richardson's

18. The ingenious analysis of the dissent is predicated upon the thesis that since the Labor Management Relations Act (Taft-Hartley) of 1947 the Board has no power to review the decision of the General Counsel whether to initiate what may be an unfair labor practice case because Congress granted unreviewable prosecutorial discretion to the General Counsel. But the broad power to investigate and prosecute complaints in no way impinges upon the Board's power to give effect to private agreements for the voluntary settlement of disputes without governmental intervention. *Spielberg*, decided in 1955, involved the refusal to reinstate five employees at the conclusion of a strike. The trial examiner found that the employer had engaged in unfair labor practices. The Board concluded that even though it might not have decided the issue as did the arbitration panel, the decision of the panel was not clearly repugnant to the policies and purposes of the Act and it would defer. When Congress enacted the Labor-Management Reporting and Disclosure Act (Landrum-Griffin Act) of 1959, Pub.L.No. 86–257, 73 Stat. 519, it did not curtail the Board's power to defer to arbitration awards in labor disputes subject to voluntary arbitration. On the contrary, it empowered the Board to decline jurisdiction in labor disputes involving any class of employers where the effect of the labor dispute on commerce is not sufficiently substantial to warrant the exercise of the Board's jurisdiction. 29 U.S.C. § 164(c)(1) (1976). Speaking five years after the Landrum-Griffin Act, the Board reiterated its "well established . . . discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act." *International Harvester Co.*, 138

N.L.R.B. 923, 925–26, *quoted in Carey v. Westinghouse Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964).

The dissent misconstrues the nature of the Board's deferral policy as a failure to exercise jurisdiction rather than the implementation of national labor policy expressed in section 203(d) and the *Steelworkers* trilogy. The Board does not decline to exercise jurisdiction when it defers to arbitration but it is accommodating the parties' choice of voluntary arbitration to the extent that the proceedings are fair and regular and the result is not clearly repugnant to national labor policy. Despite the representations of the dissent to the contrary, the Supreme Court accepted the principle of Board deference to arbitration awards in unfair labor practice disputes in *Carey v. Westinghouse Corp., supra* at 270 n.7, 84 S.Ct. at 408 n.7.

19. After the Board determined that deferral was inappropriate it remanded the case to an ALJ for further findings on the unfair labor practice charge. The ALJ concluded that Richardson's discharge was not for both an abuse of working time and the leafletting as found by the arbitrator, but primarily because of the protected leafletting.

20. *See also Linn v. Plant Guard Workers*, 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966), where the Court approved of the Board's view which tolerates intemperate, abusive, and inaccurate union statements during an organization campaign but does not, even under such circumstances, view as protected activity the intentional injury of a party "by circulating defamatory or insulting material known to be false."

leaflet called the semi-annual plant meeting a "circus" and said Pincus was instituting "pay cuts" to "our already stinking pay checks." She further stated that the Company's working conditions "ain't no different from any other stinking garment shop in this city" and that the Company was making a "lousy style of clothes." The arbitrator found that the plant meeting was a periodic semi-annual plant meeting, co-sponsored by the Union and the Company for perfectly legitimate and constructive reasons; that the Company was not instituting any pay cuts; that its average wages exceeded the industry's general average in the market area; that the working conditions at Pincus Brothers were among the best in the area; and that the Company's garments were among the finest in the industry. From the arbitrator's findings it appears at least arguable that Richardson's leaflet can be labeled as "defamatory or insulting material known to be false," *Linn v. Plant Guard Workers,* 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966), and thus can be characterized as unprotected under the Act.

Second, it is arguable that Richardson's actions constituted unprotected disloyalty. In *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard),* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953), the Court upheld the Board's refusal to order the reinstatement of workers who, during a lawful strike, issued a leaflet disparaging their employer. The Court stated:

> Section 10(c) of the Taft-Hartley Act [29 U.S.C. § 160(c) (1976)] expressly provides that "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." *There is no more elemental cause for discharge of an employee than disloyalty to his employer.*

*Id.* at 472, 74 S.Ct. at 176 (footnote omitted; emphasis supplied). The Court noted that

in protecting workers under section 7 of the Act, Congress "did not weaken the underlying contractual bonds and loyalties of employer and employee." *Id.* at 473, 74 S.Ct. at 177. In *Local Union No. 1229, supra,* the leaflet held to be objectionable was distributed during the heat of a lawful strike. Here, there was neither a strike nor any disagreement between the Company and the Union bargaining agent and thus even less justification for the arguably objectionable leaflets.

In this case the arbitrator found "a profile by [Richardson] of detrimental disloyalty tarnishing the image and impeding the legitimate business goals of the Company insofar as its other employees and its business competitors are concerned." He further found that Richardson "engaged in her course of action primarily to create or incite a maximum measure of disgruntlement and friction relating to the then functioning and long standing give and take of the ongoing collective bargaining relationship and process." Given the plain language of the leaflet and the arbitrator's view of the effect of that language we believe Richardson's conduct could arguably be characterized as unprotected disloyalty.

■ Third, it is arguable that Richardson's activity was unprotected because it was inconsistent with the fundamental policy of the Act, to encourage collective bargaining and the industrial stability flowing therefrom. In *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), the Court affirmed the Board's conclusion that minority employees had no right to bargain with the employer separate from the Union's bargaining right because to hold otherwise would undermine the statutory purpose of collective bargaining. In this case the arbitrator concluded that Richardson's activities were intended to interfere with the Company's long-established collective bargaining relationship with the

Union.[21] Given that Richardson was represented by the Union and the Union had a long and fruitful collective bargaining relationship with the Company, we conclude it is at least arguable to characterize Richardson's activity as unprotected interference with the collective bargaining process.

Finally, it is arguable that Richardson was not engaged in concerted, protected activity under our decision in *NLRB v. Northern Metal*, 440 F.2d 881 (3d Cir. 1971). In *Northern Metal* an employee was discharged because of his continued assertion that he was entitled to holiday pay for Labor Day. We refused to enforce the Board's finding of concerted action, holding that a single employee acting alone is not engaged in "concerted action" within the meaning of the NLRA. In *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969), *cert. denied* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970), we held that management must know or have reason to know that the disputed action is "concerted" before it can violate section 8(a)(1). *See also Tri-State Truck Service, Inc. v. NLRB*, 615 F.2d 65 (3d Cir. 1980).

The arbitrator concluded in the instant case that Richardson's actions were motivated by personal pique. There is no evidence that any other employee was in any way involved with the leafletting. In fact, when Richardson attempted to gain the aid of another employee, Joe Ferraro, he tore up the leaflets after reading one. Under these facts it is at least arguable that Richardson was not engaged in concerted activity.

In holding that Richardson's conduct was arguably unprotected we express no opinion on how this court or the Board would decide the merits of the unfair labor practice

charge in a trial *de novo*. We hold only that where there are two arguable interpretations of an arbitration award, one permissible and one impermissible, the Board must defer to the decision rendered by the arbitrator.[22]

## IV.

We conclude that the Board abused its discretion in not deferring to the arbitration award. Accordingly, the Board's petition for enforcement will be denied.

Costs taxed against the petitioner.

GARTH, Circuit Judge, concurring.

I agree with Judge Rosenn's opinion that the National Labor Relations Board's refusal to defer to the arbitration award in favor of Pincus must be reversed. I also fully agree with his analysis in part III, holding that the arbitral award was not "clearly repugnant" to the purposes and policies of the National Labor Relations Act. I therefore agree with his conclusion that the Board was compelled under its *Spielberg* doctrine to defer to the arbitrator's award.

I part company, however, with Judge Rosenn in his designation of the standard of review to which a Court of Appeals must adhere when it examines the Board's decision whether or not to defer to an arbitration award under *Spielberg*. I do not agree that we may only reverse the Board for an abuse of discretion. I believe that the Board's deference decisions must be reviewed under a standard of legal error.

## I.

The federal courts play a more limited role in reviewing the substantive merits of an arbitrator's award than the National La-

---

**21.** In her leaflet, Richardson acknowledged that the contract between Pincus Brothers and the Union was in effect until June. *See* n.2 *supra*.

**22.** We find it unnecessary to decide Pincus Brothers' other contention that the arbitration award should stand because the arbitrator found the discharge was caused both by Richardson's abuse of working time and her distribution of the leaflet. The Company argued that after *Mt. Healthy City School District v.*

*Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976), the Board cannot adhere to its traditional position in so-called "mixed-motive" cases that even where the discharge was in part motivated by permissible considerations, it is nevertheless unlawful if motivated at all by protected conduct. *See generally Western Exterminator Co. v. NLRB*, 565 F.2d 1114 (9th Cir. 1977); *Coletti's Furniture v. NLRB*, 550 F.2d 1292 (1st Cir. 1977).

bor Relations Board. The Supreme Court has decreed that a court must enforce an arbitral award "so long as it draws its essence from the collective bargaining agreement," *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The Court has further held that "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* at 599, 80 S.Ct. at 1362. Thus, courts have no discretion in deciding whether or not to enforce the award; they *must* enforce it if it satisfies the standards set up by the Supreme Court. Accordingly, a Court of Appeals will review a district court decision in such a case under a legal error standard, and not one of abuse of discretion.

The NLRB, however, is not so limited in its function. As the Supreme Court has noted, "the *Steelworkers* trilogy . . . dealt with the relationship of courts to arbitrators when an arbitration award is under review or when the employer's agreement to arbitrate is in question. . . . The relationship of the Board to the arbitration process is of a quite different order." *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). Because the Board *alone* has original jurisdiction to resolve charges of unfair labor practices under the National Labor Relations Act, 29 U.S.C. § 160 (1976), the Board, unlike the courts, is subject to conflicting pressures when reviewing an arbitrator's award.

On the one hand, Congress has stated that "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d) (1976). The Supreme Court has also emphasized the central role that arbitration plays in our national labor policy. *See, e. g., Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *United Steelworkers Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1359, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). *See generally, Freed, Injunctions Against Sympathy Strikes: In Defense of Buffalo Forge*, 54 N.Y.U.L.Rev. 289 (1979). These congressional and Supreme Court declarations encourage the Board to accord substantial deference to arbitration awards: "submission to grievance and arbitration proceedings of disputes which might involve unfair labor practices would be substantially discouraged if the disputants thought the Board would give *de novo* consideration to the issue which the arbitrator might resolve." *Associated Press v. NLRB*, 492 F.2d 662, 667 (D.C. Cir. 1974).

On the other hand, Congress has also provided that "The Board['s power] to prevent any person from engaging in any unfair labor practice . . . shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." 29 U.S.C. § 160(a) (1976).

It must be conceded that the inherent tension between these two principles of our national labor policy confers, *as an initial matter*, discretion on the Board in formulating a position on deference to arbitration awards. As Judge Feinberg, writing for the Second Circuit, said in *NLRB v. Horn & Hardart Co.*, 439 F.2d 674 (2d Cir. 1971), "it is worth remembering that the Board's rules on deference, after all, are self-imposed although it has followed healthy hints from the Supreme Court." *Id.* at 679. While there undoubtedly are limits on the Board's original discretion, I can assume for purposes of this opinion that the Board's discretion is large. Thus, the Board may be within its power to adopt the approach that it will defer to arbitration decisions whenever it concludes, in the exercise of its

discretion, that such deference is not inconsistent with the National Labor Relations Act. And the Board would probably be within its power to declare that, assuming procedural regularity, it will *always* defer to arbitration awards resolving alleged violations of § 8(a)(5) of the Labor Act, 29 U.S.C. § 158(a)(5) (1976) (refusals to bargain) and will *never* defer to awards resolving alleged violations of § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976) (discriminatory discharges).[1]

However, once the Board undertakes to resolve the inherent tension noted above between 29 U.S.C. § 160(a) and 29 U.S.C. § 173(d), its *original* discretion in this field is displaced. Once the Board "announce[s] a policy regarding deference to arbitration, [it cannot] blithely ignore it, thereby leading astray litigants who depended on it." *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2d Cir. 1971).[2] Rather, the Board, like all agencies, is *bound* to adhere to the regulations and decisions that it announces.[3]

Concluding that the Board is bound to follow its announced deference policy does not, of course, determine the standard by which the Courts of Appeals are to review the Board's application of its standards. It is the *content* of the deference policy that must determine the manner in which application of the policy is reviewed. This is true of all rules of law. For instance, the United States district courts are bound to follow the rule that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." F.R. Evid. 611(b). They are also bound to follow the rule that evidence seized by a State in contravention of the Fourth Amendment is inadmissible. However, review of the application of the first of these rules is governed by the abuse of discretion standard, while review of the application of the second is governed by a legal error standard. This is so because application of the cross-examination rule is regarded as committed to the sound discretion of the district court, while the exclusionary rule is purely a matter of law. Thus, we must refer to the *content* of the Board's deference policy to determine the applicable standard of review.

**1.** These hypothetical deference rules are fairly close to the actual position the Board currently takes when it is asked not to review an arbitration award already issued, but to withhold its own proceedings to await the outcome of an arbitration that has not yet been completed. This current position is the result of sharp differences among the views of the Board members and the changing composition of the Board.

Three members, Miller, Kennedy and Brown, in 1971 established the principle in Collyer Insulated Wire, 192 NLRB 837 (1971), that the Board will await an arbitration award where the dispute centers on interpretation of the contract, where there is no evidence of anti-union animus, and where the parties have a long and productive bargaining relationship with tested grievance machinery providing for arbitration. 192 NLRB at 842. The dissenters, Members Jenkins and Fanning, argued that the Board should never defer to uncompleted proceedings.

In 1977, changes in the composition of the Board produced a new approach, announced in *General American Transportation Corp.*, 228 NLRB 808 (1977) and *Roy Robinson Chevrolet*, 228 NLRB 828 (1977). The two Collyer dissenters adhered to their original view that deferral is never appropriate. Two other members, Penello and Walther, who were appointed to the Board after *Collyer*, adhered to the original *Collyer* approach. The fifth member, Murphy, appointed in 1975, staked out an independent, swing position. She would hold that the Board should never defer in cases charging interference with individual rights, such as § 8(a)(3) cases, because such rights may not receive adequate protection by a union in arbitration proceedings. Murphy would approve deferral where the dispute is between the employer and the union and where no individual rights are implicated, such as § 8(a)(5) cases, because the union is likely to press such cases vigorously. In light of the 2–2 split among the four remaining members of the Board, Murphy's vote effectively decides most cases. Thus, the Board's current position is in practice close to the hypothetical rules set forth in the text above.

**2.** *Horn & Hardart* is discussed in greater detail in section II, *infra*.

**3.** *See, e. g., Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Geiger v. Brown*, 136 U.S. App.D.C. 132, 419 F.2d 714 (D.C. Cir. 1969) (per curiam); *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221 (D.C. Cir. 1959).

If the Board had adopted the first of the hypothetical deference policies suggested above—that it will defer where it concludes, in the exercise of its discretion, that doing so will not be inconsistent with the National Labor Relations Act—it is perfectly clear that the appropriate standard of review would be an abuse of discretion standard. The policy confers discretion on the Board by its very terms. Since the Board has discretion under this policy, the Board's decision may be reversed only where the discretion has been abused.

If, however, the Board had adopted the second of the hypothetical deference policies suggested above—that it will always defer in § 8(a)(5) cases and never defer in § 8(a)(3) cases (see, e. g., note 1 supra)—it is equally clear that the appropriate standard of review would be one of legal error. The policy confers no discretion on the Board: the Board must hear and determine some cases and must defer to the arbitral award in others. If the Board refused to hear the § 8(a)(3) complaint of an employee who claimed that he had been discharged for supporting his union, and whose claim had been rejected by an arbitrator, the Board could not contend that it had the discretion to defer to the arbitrator's decision. A Court of Appeals would undoubtedly direct the Board to hear and resolve the complaint, because, by adopting the deference policy hypothesized here, the Board would have renounced its discretion in § 8(a)(3) cases; it would have bound itself to hear and determine such a case rather than defer. Thus, the particular content of this deference policy compels the conclusion that the only appropriate standard of review of a deference decision is that of legal error.

Turning to the Board's *actual* deference policy, that announced in *Spielberg Manufacturing Co.*, 112 NLRB 1080 (1955), it is again clear that the policy confers no discretion on the Board. It is equally clear that the appropriate standard of review is that of legal error. In *Spielberg*, the Board set up a three-part test. It announced that it would defer to an arbitrator's decision where "[1] the proceedings appears to have been fair and regular, [2] all parties had agreed to be bound, and [3] the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." *Id.* at 1082. The parties here have agreed that the first two elements of this test are satisfied, and thus we are not required to determine the standard of review of such determinations. Nevertheless, it appears that these two elements involve mixed questions of law and fact, and confer no discretion on the Board. Thus, the subsidiary factual components of these determinations would be reviewed under a substantial evidence test, with the ultimate legal conclusion reviewed under a legal error standard. *E. g., Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862, 865 (3d Cir. 1974); *Kaltreider v. Commissioner*, 255 F.2d 833, 837 (3d Cir. 1958); *Lehmann v. Acheson*, 206 F.2d 592, 594 (3d Cir. 1953). *See The E. A. Packer*, 140 U.S. 360, 364, 11 S.Ct. 794, 795, 35 L.Ed. 453 (1891). The third element of the test, whether the decision is clearly repugnant to the Labor Act, is, of course, a pure question of law. In making its evaluation, the Board must discern the legal basis of the arbitrator's decision, determine the relevant labor law, and decide whether the former is clearly repugnant to the latter. This standard, too, confers no discretion on the Board, and, since it is a matter of law that the Board is deciding, the appropriate standard of review must necessarily be that of legal error.

Thus, the argument may be summarized as follows. In light of the inherent tension between the two precepts of labor law embodied in 29 U.S.C. § 160(a) and 29 U.S.C. § 173(d), the Board has discretion in formulating a policy on deference to arbitration awards. Once, however, the Board announces its policy, its original discretion has been displaced; the Board is bound to follow the policy it adopts unless and until it explicitly changes that policy.[4] Whether

---

4. The Board appears to change its policies on deference with some regularity. *See General*

*American Transportation Corp.*, 228 NLRB 808 (1977); *Roy Robinson Chevrolet*, 228 NLRB

the Board's application of its deference doctrine should be reviewed by an abuse of discretion standard or a legal error standard depends on the content of the doctrine. If the doctrine confers discretion on the Board, the Board's application of it may be reversed only for abuse of discretion. The *Spielberg* doctrine, however, does *not* confer discretion on the Board. Rather, it requires the Board to determine whether each of the three parts of the *Spielberg* test is satisfied, each of which ultimately involves a nondiscretionary question of law. Necessarily, then, the Board's *Spielberg* decision must be reviewed under a standard of legal error.

## II.

I freely acknowledge that all of the courts that have expressed themselves on the issue have indicated that the Board's application of the *Spielberg* doctrine is reviewed under an abuse of discretion standard. I find none of them compelling. Indeed, a review of these cases reveals that they either engage in no analysis at all, relying on their mere *ipse dixit*, or employ an analysis that stops short of the critical question.

Many cases reflect an abuse of discretion standard only through the unelaborated assertion that the Board's deference decision will only be reversed for abuse of discretion, or by phrasing the question presented as whether the Board has abused its discretion. *See, e. g., International Ass'n of Machinists Local 1309 v. NLRB*, 530 F.2d 849, 850 (9th Cir. 1976) (per curium); *Lodges 700, 743, 1746, International Ass'n of Machinists v. NLRB*, 525 F.2d 237, 239, 244, 245, 246 (2d Cir. 1975); *Associated Press v. NLRB*, 492 F.2d 662, 666, 668 (D.C. Cir.

828 (1977); *Collyer Insulated Wire*, 192 NLRB 837 (1971); note 1 *supra*. There even has been some suggestions from the Board recently that the *Spielberg* doctrine may come in for some modification. *See Servair, Inc.*, 236 NLRB 1278, 1278 n. 1 (1978) ("Accordingly, we find it unnecessary to determine, in these circumstances, whether our decision in *Spielberg Manufacturing Company*, 112 NLRB 1080 (1955), is in any way affected by our recent decision in *General American Transportation*

1974); *Ramsey v. NLRB*, 327 F.2d 784, 786, 788 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). Those that do engage in an analysis invariably go only part way. They assert, on the one hand, that the Board has discretion in deciding whether to defer to an arbitrator's award. They also assert, on the other, that *Spielberg* governs the Board's exercise of discretion. Of course, I have no quarrel with the analysis to this point, for I employ the same analysis myself. But these cases never reach the critical question of *how Spielberg* governs this discretion, *i. e.*, they never discuss whether *Spielberg* leaves substantial discretion in the hands of the Board, such that its application of *Spielberg* can only be reviewed under an abuse of discretion standard, or, rather, whether *Spielberg* establishes a fixed deference doctrine, the application of which should be reviewed under a legal error standard.

Typical of these cases is the Tenth Circuit decision in *NLRB v. Auburn Rubber Co.*, 384 F.2d 1 (10th Cir. 1967). The court there merely stated, without more, that:

> In our opinion the Board has the discretion to defer to, or to reject, the decision of the arbitrator and, in determining whether that discretion has been properly exercised, the tests announced by *Spielberg* are pertinent.

384 F.2d at 3 (footnote omitted).

The Ninth Circuit in *Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674 (9th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977), in subscribing to an abuse of discretion standard, nevertheless describes its rationale in terms more suggestive of a standard of legal error. The court stated that:

*Corporation*, 228 NLRB 808 (1977)"), *enforcement granted in part and denied in part, Servair, Inc. v. NLRB*, 102 LRRM 2705 (9th Cir. 1979), *reh. granted*, No. 78–2791 (9th Cir. Nov. 19, 1979). But there is no question that the Board found the instant case governed wholly by the *Spielberg* doctrine; the Board's deference decision explicitly cites *Spielberg* and quotes its three-part standard without any suggestion that it is no longer applicable. *Pincus Brothers, Inc.*, 99 LRRM 1099, 1100 (1978).

The Board has established criteria to guide its decision and to this extent self-imposed restraints limit its discretion. In reviewing the Board, we must insure that it adheres to its own standards until they are properly changed by the Board. We will not deny enforcement unless the Board clearly departs from its own standards or its standards are themselves invalid.

545 F.2d at 676 (footnotes omitted).[5]

Similarly, the Second Circuit's opinion in *NLRB v. Horn & Hardart Co.*, 439 F.2d 674 (2d Cir. 1971), which is relied upon by Judge Rosenn in support of an abuse of discretion standard, is not contrary to my analysis in support of a legal error standard. The court there stated:

But it is worth remembering that the Board's rules on deference, after all, are self-imposed although it has followed healthy hints from the Supreme Court. Nevertheless, so far as we know, in no case has the Court directed the Board to defer to an arbitration award, . . . so that its discretion in this respect must be regarded as large. We do not suggest that the Board can announce a policy regarding deference to arbitration and then blithely ignore it, thereby leading astray litigants who depended upon it. But it can change its mind or alter its standards for deference in some respects without necessarily engaging in conduct so blameworthy as to justify our calling it abuse of discretion.

439 F.2d at 679 (citation omitted).

This excerpt from *Horn & Hardart*, despite the reference in the last sentence to "abuse of discretion," does not, in fact, support the view that *Spielberg* determinations may only be reviewed under an abuse of discretion standard. The *Horn & Hardart* analysis is not concerned with reviewing the Board's *application* of *Spielberg*, but rather with the Board's power to *change* the *Spielberg* standard: "[the Board] can alter its standards for deference in some respects

without . . . . our calling it abuse of discretion." Since the Board has *original* discretion to select among various deference standards, it unquestionably has discretion to change its mind and thus change its own standard. But that, of course, is not the question that we face. And on the question that *is* presented—our review of the Board's application of *Spielberg*—it is clear that *Horn & Hardart* provides minimal guidance. Thus *Horn & Hardart*, like *Auburn Rubber* and *Hawaiian Hauling*, simply does not undercut the analysis advanced here in support of a standard of legal error.

### III.

Judge Rosenn in his opinion for the Court, at 375 n.18, rejects the view expressed in Judge Gibbons's dissent that the Board generally has no power to defer to arbitration proceedings. I agree wholeheartedly with Judge Rosenn's position. I add my own thoughts only to emphasize that, despite Judge Gibbons's scholarly analysis, I cannot accept his conclusion.

Judge Gibbons, while arguing that the Board generally has no power to defer, does accept, at least at this time, a limited deferral policy in "section 8(a)(5) and section 8(b)(3) cases involving contract interpretation matters in which the interpretation of the contract by the agreed upon method in effect eliminates the predicate for the charge." (At 399). Overall, though, he makes plain that he has the gravest reservations about the Board's authority to defer in *any* case, with the sole exception of jurisdictional disputes among unions, for which there is statutory authority for deferral. *See* 29 U.S.C. § 160(k) (1976).

I do not share Judge Gibbons's reservations about the Board's power to defer. As I have noted, I believe Board discretion in this area flows inevitably from the tension between two elements of our national labor policy: on the one hand, the centrality of arbitration in maintaining industrial peace, and, on the other, the Board's continuing

**5.** Similar analyses are found in *Douglas Aircraft Co. v. NLRB*, 609 F.2d 352 (9th Cir. 1979); *Servair, Inc. v. NLRB*, 102 LRRM 2705 (9th Cir. 1979), *reh. granted*, No. 78–2791 (9th Cir. 1979).

authority to resolve unfair labor practice charges regardless of any independent dispute resolution mechanism agreed upon by the parties. Deference to arbitration under the three-prong *Spielberg* test contributes significantly to the first of these elements, the encouragement of arbitration as a critical factor in labor-management relations. Thus, while much of what Judge Gibbons says is persuasive, I do not believe his position gives sufficient weight to the importance of arbitration, as expressed in the *Steelworkers Trilogy* and other Supreme Court cases. *See* at 378, *supra.*

Further, I believe Judge Gibbons's position is largely foreclosed by the Supreme Court's plain approval of the deferral doctrine in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270–72, 84 S.Ct. 401, 408–409, 11 L.Ed.2d 320 (1964). Judge Gibbons properly points out that *Carey* presented an instance of deferral to arbitration in the jurisdictional dispute context. *Carey's* approval of the deferral doctrine, however, was in no way limited to these cases alone. Indeed, the Board's statement of its discretionary authority to defer, which is quoted with approval by the Court in *Carey*, comes from a case in which the Board deferred to an arbitration award involving, in part, a charge of discriminatory treatment in violation of § 8(a)(3). *See International Harvester Co.*, 138 NLRB 923 (1962), *enf'd sub nom. Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). Judge Gibbons would find these circumstances to present the least defensible case for deferral, yet the Supreme Court, in quoting *International Harvester* with approval, makes no suggestion that deferral in that case was inappropriate.[6] And like the Court, the Board as an institution has never denied its own authority to promulgate a deferral doctrine, despite the dissents of two of its members who have employed many of the same arguments made by Judge Gibbons here.

Thus, as I see it, I would sum up as follows: The Board unquestionably has the power to establish rules and legislative policy. One such policy established by the Board is that of deferral to arbitration at any stage. Once established, such a policy operates to require deferral as a matter of law in the particular areas identified by the

---

**6.** There are other suggestions in the opinion that the Court was not limiting its approval of the Board's deferral policy to the statutorily authorized jurisdictional dispute context. The Court quoted with approval the Board's opinion in *Raley's Inc.*, 143 NLRB 256 (1963), in which the Board extended its deferral policy from the unfair labor practice context to the representation dispute context. In the portion of *Raley's* quoted by the Court, the Board wrote:

> In the recently decided *International Harvester Company* case, a majority of the Board indicated that it would give "hospitable acceptance to the arbitral process" in order "to promote industrial peace and stability by encouraging the practice and procedure of collective bargaining." Relying on various statutory provisions, particularly Section 203(d) of the Labor Management Relations Act, 1947, and on decisions of the United States Supreme Court which recognize arbitration as "an instrument of national labor policy for composing contractual differences," the Board concluded that it would withhold its undoubted authority to adjudicate unfair labor practice charges and give effect to arbitration awards involving the same subject matter "unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act." While it is true that *International Harvester*, as well as other cases in which the Board honored arbitration awards, involved unfair labor practice proceedings, we believe that the same considerations which moved the Board to honor arbitration awards in unfair labor practice cases are equally persuasive to a similar acceptance of the arbitral process in a representation proceeding such as the instant one. Thus, where, as here, a question of contract interpretation is in issue, and the parties thereto have set up in their agreement arbitration machinery for the settlement of disputes arising under the contract, and an award has already been rendered which meets Board requirements applicable to arbitration awards, we think that it would further the underlying objectives of the Act to promote industrial peace and stability to give effect thereto.

143 NLRB at 258–59 (footnotes omitted), quoted in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270 n.7, 84 S.Ct. 401, 408 n.7, 11 L.Ed.2d 320 (1964).

Board. The Supreme Court, in recognizing the inherent advantage of consensual relationships between labor and management, has never denied, but, rather, has endorsed and encouraged the Board's power to establish a deferral doctrine. Similarly Congress, which could not have been blind to the Board's deferral doctrine since its adoption in *Spielberg* in 1955, has legislated against neither the Board's power to establish such a policy, nor against the policy itself.

Accordingly, if the Board, in the exercise of its expertise, and pursuant to its legislative mandate, announces a deferral policy, then those over whom the Board exercises authority are entitled to rely upon this policy. Likewise, the courts are entitled to expect that the Board will follow its policy, until such time as, in the Board's discretion, the policy is either abandoned, revoked or modified. In short, the Board must live by the rules that it establishes. It is in this context that I have urged in this opinion that the Board's policy, *once established and until changed*, must be reviewed as a matter of law, and not discretion.

Judge Gibbons, as a result of the position that he takes, does not address the question of the appropriate standard of review. He notes only that a Board decision *not* to defer should *never* be reversed by a Court of Appeals (At 399). Due to the differences in our approach, I necessarily disagree with this position.

### IV.

I have reviewed here the cases that address the question of the standard of review by which a *Spielberg* decision should be reviewed in the Courts of Appeals. Since none of these cases undertakes an analysis of the only question that I regard as critical, I am unpersuaded by their declarations that the Board's application of its *Spielberg* doctrine can be reversed only for an abuse of discretion. I am convinced that once the Board voluntarily limits the discretion it originally possessed in this field and declares a policy of its own making, we have a duty to hold the Board to the policy it has

chosen. And if that policy does not reserve discretionary power to the Board, as *Spielberg* by its very terms and nature does not, we ought not review applications of the policy as if it did. The Board retains the power to reclaim its original discretion in this field by abandoning *Spielberg* and setting up a new standard. But the Board has not yet done so. We ought not do what the Board itself has not seen fit to do, *i. e.*, reinstate the Board's pre-*Spielberg* discretionary policy, by reviewing its decisions under an abuse of discretion standard.

Thus, I conclude this analysis as I began it: the Board's deference decisions, stemming as they do from the Board's self-imposed deferral policy, should be reviewed by the Courts of Appeals under a standard of legal error.

GIBBONS, Circuit Judge, dissenting.

The petition and cross petition require this court to consider directly for the first time the highly controversial *Spielberg-Collyer* doctrine of the National Labor Relations Board. The doctrine, which is entirely a product of the Board, and which even in that tribunal has never achieved unanimous approval, is that it is proper, in some instances, to refuse to adjudicate an unfair labor practice charge filed by the General Counsel, and to defer to the decision, past or prospective, of an arbitrator. Without acknowledging that the issue of Board deferral to arbitration in unfair labor practice cases in any instance is significantly controversial, the majority first assumes that the *Spielberg-Collyer* doctrine should be approved by this court. But the majority goes much further. It does what only one other court of appeals has ever done before, holding that there are instances where the Board *must* decline to hear an unfair labor practice charge made by the General Counsel. While I share the doubts of Board members Fanning and Jenkins about the legality of the *Spielberg-Collyer* doctrine in any case in which the General Counsel has filed an unfair labor practice charge, it is not necessary to take a definitive position on their side of the controversy for all pur-

poses in this case. It suffices here to say that whatever merit *Spielberg-Collyer* may have when applied to a narrow class of unfair labor practices, the charge in this case does not fall within that class. Deferral, in my view, would have been a violation of the Act. A fortiori the Board did not err in refusing to defer.

## I.

The powers of the Board are entirely statutory. When considering whether a given action is within or outside of the powers of a statutory administrative agency a good, if not an essential, starting point is the governing statute, here the Labor Management Relations Act. As originally enacted in 1935, the National Labor Relations Act conferred on the Board all-embracing authority in two separate areas: unfair labor practices (section 8) and election or representation matters (section 9). In 1947, the Taft-Hartley Act made significant changes with respect to unfair labor practice cases. *See Legislative History of the Labor Management Relations Act of 1947* at 1661 (comparing 1935 and 1947 Acts) [hereinafter *Legislative History*]. While the Board was left with all-embracing authority in representation cases, it was stripped of the functions of investigating and prosecuting unfair labor practice cases. *See id.* at 1664–77 (comparing 1935 and 1947 Acts) *Compare* National Labor Relations Act of 1935, ch. 372, §§ 3, 9, 10, 49 Stat. 449 (1935) *with* Labor Management Relations (Taft-Hartley) Act of 1947, Pub.L.No.101, §§ 3, 8, 9, 10, 61 Stat. 136 (1947). Those functions, under section 3 of the Taft-Hartley Act, 29 U.S.C. § 153(d), were assigned to the General Counsel, who was to be appointed by the President with the approval of the Senate, rather than by the Board. The Board's authority with respect to unfair labor practices therefore became primarily adjudicatory. The decision to vest prosecutorial discretion in the General Counsel was a conscious one, related to the decision made by the same Congress to proscribe unfair labor practices by unions as well as by employers under section 8 of the Act.[1] Under the statute as currently codified, the Board retains both investigative and decisionmaking functions in representation cases filed pursuant to section 9, but these functions are divided between the Board and the office of the General Counsel with respect to section 8 unfair labor practice charges.

In practice today an unfair labor practice case is initiated by the filing of a charge in

---

1. The Report of the House Committee that studied the original House version of the bill stated that the decisions to revamp the Board and create an independent investigating and prosecuting official and the decision to add the union unfair labor practices of section 8(b) both served to prevent the Board from rendering arbitrary and prejudicial decisions and to prevent "the new Board from repeating the old Board's mistakes." H.R.Rep.No.245, 80th Cong., 1st Sess. 6–7 (1947), *reprinted in Legislative History* at 297–98. Both the House and Senate bills evidenced a general dissatisfaction with the operation of the Board. The House bill, H.R.3020, would have replaced the NLRB with a Board of three members, appointed by the President with the advice and consent of the Senate, which would have been vested with solely quasi-judicial powers. The bill would also have created a completely independent executive agency headed by an administrator, who would have been appointed by the President with the advice and consent of the Senate, and whose functions would have been

> to investigate charges of unfair labor practices, to issue complaints if he has reasonable

cause to believe such charges are true, to prosecute such complaints before the Board, to make application to the courts for enforcement of orders of the Board, to investigate representation petitions and conduct elections under section 9, and to exercise such other functions as are conferred on him by this Act.

H.R.3020 § 4, 80th Cong., 1st Sess. (1947), *reprinted in Legislative History* at 173–75. Thus, the drafters of the House bill first intended to divorce the investigatory and prosecuting functions from the decisionmaking role of the Board and to ensure unbiased decision making by requiring appointment of impartial Board members. *See* H.R.Rep.No.245, 80th Cong., 1st Sess. 19, 25–26, 40 (1947), *reprinted in Legislative History* at 310, 316–17, 331 (describing functions of new Board and administrator).

Although also acknowledging the shortcomings of the NLRB, the original Senate bill sought to remedy the Board's supposed excesses by the addition of four new members and by the imposition of a reporting requirement. *See* S.1126 § 3, 80th Cong., 1st Sess. (1947), *reprinted in Legislative History* at 106–07.

a regional office of the Board by a person claiming to be aggrieved. The charge is investigated by a field representative, and a decision is made by the Regional Director whether a complaint will issue. A determination by the Regional Director not to issue a complaint may be appealed to the General Counsel who, by statute

> shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title,[2] and in respect of the prosecution of such complaints before the Board.

29 U.S.C. § 153(d). The General Counsel's decision whether or not to issue a complaint is unreviewable. *E.g., Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); *Newspaper Guild v. NLRB*, 489 F.2d 416, 426 (3d Cir. 1973); *United Electrical Contractors Ass'n v. Ordman*, 366 F.2d 776, 776 (2d Cir. 1966) (per curiam), *cert. denied*, 385 U.S. 1026, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967); *see Leeds & Northrup Co. v. NLRB*, 357 F.2d 527, 533–35 (3d Cir. 1966) (distinguishing between unreviewable decision not to issue a complaint and reviewable decision to settle). Given that Congress has granted unreviewable prosecutorial discretion to the General Counsel, it is hard to find in the structure of the Act authority for the Board to second guess the exercise of that discretion. In a case in which the Board had asserted that it had the power to decline to pass upon an unfair labor practice charge filed by the General Counsel, Judge McCree wrote:

> We begin our inquiry whether the Board may decline to decide if conduct complained of by the General Counsel is an unfair labor practice under the Act, by examining the language of the statute. Section 10(c), 29 U.S.C. § 160(c), reads in pertinent part:
>
> > If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engag-

ing in any such unfair labor practice, then the Board shall state its findings of facts and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: * * * If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.

> The plain language of section 10(c) indicates that the Congress has authorized the Board to make one of two responses when it has heard a complaint brought by the General Counsel: it must determine either that a violation occurred, or that it has not. We find no express authorization in the statutory language for the Board to abstain from deciding whether conduct violates the Act. Apparently the Board believes that the words "as will effectuate the policies of this subchapter" qualify not only its obligation to issue remedial orders but also its duty to decide whether a violation has occurred. We think it clear that the clause on which the Board relies modifies only its discretion to determine the scope of such remedial order as it may issue and does not negative the statutory mandate that it "shall" decide the existence *vel non* of a charged violation. We find no authorization in the statute for the Board's abstention from its duty to decide complaints properly brought before it.

*International Union, United Auto. Aero. & Agric. Implement Workers v. NLRB*, 427 F.2d 1330, 1331–32 (6th Cir. 1970). That analysis seems entirely consistent with the structure of the Act. It ought to be controlling with respect to any claimed power

---

**2.** Section 160 of the title, 29 U.S.C. § 160, is section 10 of the Act, which deals with the prevention of unfair labor practices.

of the Board to defer, or of this court to insist upon deferral to another tribunal unless there is statutory authority, elsewhere, authorizing deferral.

There is such authority, but only with respect to a single specific unfair labor practice. Section 10(k) of the Act provides:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute.

29 U.S.C. § 160(k). The unfair labor practice to which section 10(k) refers is a strike or other coercion an object of which is

forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization . . . unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

29 U.S.C. § 158(b)(4)(D). That unfair labor practice—striking for work acquisition—was a critical issue addressed by the Taft-Hartley Act. See, e.g., S.Rep.No.105, 80th Cong., 1st Sess. 7–8, reprinted in Legislative History at 413–14 (accompanying S.1126)

(noting that all witnesses in hearings called for federal control of work acquisition strikes; providing for injunctions and arbitration); S.Rep.No.105, pt. 2, 80th Cong., 1st Sess. 18, reprinted in Legislative History at 480 (minority views) (agreeing with policy of prompt disposition by Board or arbitration); H.R.Rep.No.245, 80th Cong., 1st Sess. 23, reprinted in Legislative History at 314 (noting that work acquisition strike unfairly victimizes innocent employer). It is intimately related to the Board's Section 9 representation jurisdiction,[3] a jurisdiction over which the General Counsel does not have authority to exercise prosecutorial discretion. The line between work assignment disputes and representation disputes is often difficult to discern and the direction to the Board in section 10(k) to defer to arbitration rather than decide the charge is consistent with the Act's special treatment of jurisdictional disputes. Notably, in the only instance in which the Supreme Court spoke approvingly of Board deferral to arbitration it did so in the jurisdictional-representational dispute context. Carey v. Westinghouse Corp., 375 U.S. 261, 271–72, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964). Neither that case nor Board cases deferring to arbitral solutions of section 8(b)(4)(D)[4] charges, nor Board cases deferring to arbitration with respect to eligibility to vote in representation cases,[5] lend support to an assumed general power to abstain from adjudicating unfair labor practice charges.

One other statutory grant of authority to abstain from the exercise of jurisdiction bears mentioning. In the Landrum-Griffin

---

**3.** In each version of the bill, the prohibition on striking for work acquisition was tied to the section 9 representation section. Compare H.R.3020, 80th Cong., 1st Sess. §§ 2(15), 12(a)(3)(A), reprinted in Legislative History at 169, 205 (original House Bill) and S.1126, 80th Cong. 1st Sess. § 8(b)(4), reprinted in Legislative History at 112–13 (original Senate version) with Labor Management Relations (Taft-Hartley) Act of 1947, Pub.L.No.101, § 8(b), 61 Stat. 136, reprinted in Legislative History at 6–8 (adopting House bill with Senate amendment).

**4.** E.g., Louisiana-Pacific Corp. v. IBEW, 600 F.2d 219, 224–26 (9th Cir. 1979) (deferral to two arbitration awards in work assignment dis-

pute); NLRB v. Southern Calif. Dist. Council of Laborers, 443 F.2d 220, 221–23 (9th Cir. 1971) (if parties agree to voluntary means of settlement of jurisdictional dispute, Board must accept); cf. NLRB v. Local 825, Int'l Union of Operating Eng., 410 F.2d 5, 8–9 (3d Cir. 1969) (party to voluntary private method of settlement of § 8(b)(4)(D) dispute cannot challenge result before Board), rev'd on other grounds, 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971) (approving § 8(b)(4)(D) result).

**5.** Raley's, Inc., 143 N.L.R.B. 256, 258–59 (1963); Pacific Tile & Porcelain Co., 137 N.L.R.B. 1358, 1365–67 (1962).

Act of 1959, Congress added section 14(c), which gives the Board discretion "[to] decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." Labor-Management Reporting and Disclosure (Landrum-Griffin) Act of 1959, Pub.L. No.86–257, § 701(a), 73 Stat. 519, *currently codified at* 29 U.S.C. § 164(c)(1) (1976). The effect of section 14(c) was to confirm the Board's assumption, first evidenced in *Hollow Tree Lumber Co.*, 91 N.L.R.B. 635 (1950), of the power to decline to exercise jurisdiction, under section 8 or section 9, over classes of employers believed not to have a significant effect on commerce. *Office Employes Int'l Union v. NLRB*, 353 U.S. 313, 320, 77 S.Ct. 799, 803, 1 L.Ed.2d 846 (1957) (acknowledging Board discretion to decline to assert jurisdiction over local employers not affecting interstate commerce); *see Hotel Employes v. Leedom*, 358 U.S. 99, 99 (1958) (per curiam) (Board's refusal to exercise jurisdiction over hotel industry fails to comport with standards approved in *Office Employes Int'l Union v. NLRB*, 353 U.S. at 318–20, 77 S.Ct. at 802–03). But as with section 10(k), the express authorization of power to exclude from coverage classes of employees, on the basis of an insubstantial effect, on commerce, is no support for a general policy of deferral to contract arbitration in unfair labor practice cases where, as here, commerce plainly is affected. No other provision of the Act authorizes either deferral to arbitration or exclusion from jurisdiction by the Board.

## II.

Thus there is no apparent statutory basis for a general Board deferral policy. Nevertheless, since its decision in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), the Board has asserted that it has discretion to defer to the decision of an arbitrator and decline to decide an unfair labor practice charge not falling within section 10(k). In *Spielberg* the dispute concerned an employer's refusal to reinstate four strikers for misconduct. The strikers had lost in arbitration but the General Counsel had filed section 8(a)(1) and 8(a)(3) charges on their behalf. Recognizing that it was not bound by any arbitration award, the Board nevertheless held that it would defer to an arbitrator's award if the award fulfilled three criteria.[6] The Board's decision in *Spielberg* was not reviewed. In *International Harvester Co.*, 138 N.L.R.B. 923 (1962), *enf'd sub nom. Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964), the Board deferred to the decision of an arbitrator that an employee was properly discharged for nonpayment of union dues, even though the employee was not given notice of and did not participate in the arbitration hearing, and even though his interests and those of the union which processed the grievance and arbitration were not congruent. The General Counsel's section 8(a)(3) charge against the employer and section 8(b)(2) charge against the union were therefore dismissed. 138 N.L.R.B. at 928–29. In both *Spielberg* and *International Harvester*, as in other cases, the Board deferred to completed arbitral decisions adverse to the charging party in the unfair labor practice case. In *Dubo Manufacturing Corp.*, 142 N.L.R.B. 431 (1963), which represented an advance in the Board's position, it deferred, temporarily, to a pending but unresolved arbitration proceeding. Subsequently, however, the Board decided the charges. *See NLRB v. Dubo Mfg. Corp.*, 353 F.2d 157, 160–61 (6th Cir. 1965) (per curiam) (granting petition for enforcement). Finally in *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971), faced with a section 8(a)(5) charge that an employer had unilaterally changed working conditions and the terms of employment, the Board

---

6.  *Spielberg Mfg. Co.*, 112 N.L.R.B. at 1081–82. The three criteria set forth by the Board are: [1] the proceedings appear to have been fair and regular, [2] all parties had agreed to be bound, and [3] the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act. *Id.* at 1082.

for the first time held that it would defer to a contract arbitration procedure that had not yet been invoked. *Id.* at 843. Two Board members, Fanning and Jenkins, dissented vigorously, and have adhered to the position that deferral is rarely appropriate ever since.

Several striking anomalies are presented by the *Spielberg-Collyer* doctrine. The first is that application of the doctrine produces no savings in time, effort or cost in the administrative process. In unfair labor practice cases the Board never hears testimony and rarely hears oral argument. It reviews a written decision of an administrative law judge and a record made before that judge. It is not until what amounts to an appellate stage of the administrative process that the decision to defer to an arbitration award or to the arbitral process is made. By then a regional office has conducted an investigation of the charge and either the Regional Director or the General Counsel has issued a complaint or, if the Regional Director dismissed the charge, the General Counsel has reviewed the results of the investigation and made a decision in favor of prosecuting the charge, and the prosecution of the charge has gone forward through hearing and decision.[7] None of the time and effort thus invested in the charge is recapturable, and the only apparent effect of the deferral decision at this late stage is to deter the Regional Director or General Counsel from deciding to prosecute future charges rather than to relegate the charging party to a contract remedy of arbitration.

That possible deterrent policy exposes the second anomaly of the *Spielberg-Collyer* doctrine. As the doctrine has been formulated by the Board, and as it has been applied, it provides no effective control over the General Counsel's prosecutorial discretion, because the result of its application in any given case is entirely unpredictable. In

the seminal *Spielberg* case, the Board indicated that deferral even to a completed arbitration was far from automatic. The Board held that it would only defer if it concluded that the arbitration proceedings were fair and regular, that all parties had agreed to be bound by the arbitration award and that the result was not clearly repugnant to the Act. *Spielberg Mfg. Co.*, 112 N.L.R.B. at 1082. Thus the Board always assumed that it had a residual power to disregard an award. When *Collyer* enlarged the policy of deference to contract arbitration procedures not yet resorted to, the Board reconfirmed the existence of that residual power by including a clause in the deferral order reserving jurisdiction over the case until completion of arbitration. *Collyer Insulated Wire*, 192 N.L.R.B. at 843. That clause has now become a standard one in deferral orders. The reasons for the Board's policy of examining arbitration awards for compliance with the Act are not hard to find. First, the statute itself charges the Board with responsibility for the interpretation and enforcement of the Act. 29 U.S.C. § 160(a). Section 10(a) of the Act thus provides that the Board's power "to prevent any person from engaging in any unfair labor practice . . . shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." *Id.; see Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 330 (7th Cir. 1976) (upholding Board's refusal to defer on ground that award would violate employee's § 7 rights.) Although one of the general policies underlying the Act is the encouragement of peaceful means of settling labor disputes, *see* 29 U.S.C. §§ 151, 173(d) (1976), it is a mistake to read that part of the Act that specifically encourages such settlements as altering the authority vested in the Board in section 10(a). Neither section 203 nor the so-called *Steelworker's* trilogy[8]

---

7. 29 C.F.R. §§ 101.2 to .8 (1979) (§ 160(a) unfair labor practice procedure); *id.* § 102.15 to .51 (1979) (§ 160(a) unfair labor practice procedure).

8. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) (§ 301 suit to compel arbitration of grievances); *United Steelworkers of America v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (§ 301 suit to

mandates the result reached by the majority in this case. Section 203(d), 29 U.S.C. § 173(d), encourages peaceful, voluntary means of settlement in the context of a labor dispute arising in the course of pre-contract collective bargaining and is limited to the settlement of such disputes through use of the Federal Mediation Service.[9] Nor does the *Steelworkers* trilogy require automatic Board deferral to arbitration awards. The *Steelworkers* opinions deal solely with the authority of the federal courts to require reluctant parties to adhere to the contract agreement to arbitrate. However, ultimate enforcement authority under section 8 of the Act rests with the Board, and neither section 203(d) nor the Court's general endorsement of contract arbitration in the *Steelworkers* trilogy alters the statutory scheme.

Second, the Board performs a public policy function not served by an arbitration. As the Supreme Court held,

> [t]he Board . . . does not exist for the "adjudication of private rights;" it "acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining."

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 193, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941), *quoting National Licorice Co. v. NLRB*, 309 U.S. 350, 362, 60 S.Ct. 569, 575, 84 L.Ed. 799 (1940). Obviously a remedy selected by an arbitrator in processing an individual grievance may be wholly inadequate to enforce the public policy against unfair labor practices. Reinstatement of a single victim of a discharge for engaging in protected activity, for example, may afford no protection for other potential victims of similar discrimination, while a Board order could afford such protection. Finally, inasmuch as an arbitrator is not even required to prepare findings of fact, there may be instances in which the reasons for his decision, and thus its consistency with the policies behind the Act are both unknown and unknowable. A policy of absolute deferral would be plainly inconsistent with the Board's public responsibilities. But by the same token, the practical consequences of waiting until after an award has been made before deciding whether or not to defer is to make the deferral decision largely irrelevant to the General Counsel's charging decision. A charge must be made by the charging party within six months of the acts complained of. 29 U.S.C. § 160(b). The charging party often will have been engaged in statutorily protected activity which conflicts with the interests of the majority in the designated collective bargaining agent, and may not be fully confident that a contract remedy will vindicate minority protected rights. In many instances the charge will be filed before an arbitration proceeding concerning the employee's grievance has been commenced. In other cases the charge may be filed at some stage of a prolonged multi-stage grievance procedure which has not yet culminated in arbitration. At that point neither the Regional Office, which is responsible for investigation, nor the Regional Director, who may decide to file a complaint, nor the General Counsel, who is ultimately responsible for the decision to file a complaint, has any way of anticipating whether or not the arbitrator's decision

---

compel arbitration of dispute concerning meaning of contract); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (§ 301 suit to compel compliance with arbitrator's construction of contract).

**9.** *See* 29 U.S.C. §§ 171–183 (establishing Federal Mediation and Conciliation Service). Section 203(d) provides

> Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation

of an existing collective-bargaining agreement. The Service is directed to make its conciliation and mediation services available in the settlement of such grievance disputes only as a last resort and in exceptional cases. 29 U.S.C. § 173(d). This section simply means that privately agreed upon settlement methods, including arbitration, are to be preferred over mediation by the Federal Mediation and Conciliation Service. The section does nothing to change the distribution of discretion and enforcement authority in sections 8, 9 and 10 of the Act.

will satisfy the public's interest in preventing unfair labor practices. The public interest generally would seem to require investigation and prosecution while the information and evidence are available. Even aside from these evidentiary concerns, the Regional Director or General Counsel must at least anticipate that an arbitrator's award may be inadequate for the vindication of the public interest. They must also be in a position to have an administrative law judge's decision available for Board review, should the award be inadequate, because the Board has no independent jurisdiction to review arbitration awards. The Board can only exercise its *Spielberg-Collyer* discretion in connection with the review of an administrative law judge's decision. The administrative law judge, of course, in reliance on *Spielberg and Collyer* might choose to defer. But unless the Regional Director or the General Counsel has first made a charging decision and has obtained a decision from an administrative law judge, the Board will never have an opportunity to consider the arbitration award in light of the public interest.

Aside from the practical difficulty that the *Spielberg-Collyer* decision to defer almost inevitably is made at the end rather than at the beginning of the administrative agency process, there is the further anomaly that while the Board claims to be exercising its discretion, the standards governing that exercise have not been readily discernible. Unfair labor practice charges are not fungible. In some cases the predicate for the charge may be entirely dependent upon the meaning of a collective bargaining contract. Charges of unilateral action in violation of a duty to bargain collectively typically present this sort of issue. If the action complained of did not violate the terms of the agreement it was not unilateral and there could be no section 8(a)(5) employer or section 8(b)(3) union violation. In such a case, which involves a pure contract dispute, once the terms of the contract are determined the public interest in the matter ends. In other cases, however, even if a contract remedy is available the conduct complained of is independently illegal, and cannot be made legal regardless of the interpretation of the contract's terms. Charges of interfering with, restraining, or coercing employees in violation of sections 8(a)(1), 8(b)(1), or 8(b)(2), charges of retaliation in violation of section 8(a)(4), or charges of domination or interference in violation of section 8(a)(2) come to mind as examples of the latter category of dispute. In such cases the public interest transcends the interest of the parties to a collective bargaining agreement. Those parties cannot agree to permit that which is illegal under the Act, and cannot bargain away the public interest by insisting on remedies that are inadequate for its vindication. Moreover in many instances, and probably in this case, there is, if not an actual conflict of interest, at least a lack of congruity of interests between the individual rights protected by sections 8(a)(1), 8(a)(2), 8(a)(4), 8(b)(1), and 8(b)(2), and the collective rights protected by the duty to bargain collectively. When *Collyer* was decided the majority made the possibly valid point that if the unfair labor practice charge depends solely on the meaning of the contract it is not unfair to insist that the arbitrator chosen by the parties construe its meaning and fill in the gaps in the contract before the Board acts. Had the Board adhered to that position, at least the Regional Director and the General Counsel would have had some discernible policy against which to measure their and the Board's discretion. But the line purportedly drawn in *Collyer* had already been breached in *Spielberg*, a case involving picket line conduct arguably protected by section 7 of the Act.

In the post-*Collyer* case of *National Radio Co.*, 198 N.L.R.B. 527 (1972), the Board deferred to the process of arbitration in a case involving a section 8(a)(3) ·discrimination claim and a section 8(a)(5) unilateral action claim, although the administrative law judge had found that no substantive contract provisions were in dispute. Moreover, the Board deferred in spite of the possibility that the acts of the employer could amount to "no breach of [the contract] agreement, but [which would] nevertheless

[be] prohibited by the Act because undertaken for a discriminatory motive." *Id.* at 530. Members Fanning and Jenkins, dissenting in *National Radio Co.*, pointed out that the majority's action amounted to nothing less than a "subcontracting to a private tribunal of the determination of rights conferred and guaranteed solely by the statute." 198 N.L.R.B. at 533 (Fanning & Jenkins, dissenting).

Taking the *National Radio Co.* case at face value, the Board would apparently find legal a contract provision whereby the union waived, on behalf of its members, their right to complain of unfair labor practices, and relegated them to an arbitral forum. Given the *National Radio Co.* holding, there was no category of *legal* issue which the General Counsel could identify as falling outside the *Spielberg-Collyer* doctrine. At the same time the Board continued to adhere to its retention of jurisdiction position, reserving, as properly it had to, the authority to examine the fairness of the award and its consistency with the policies of the Act. *See National Radio Co.*, 198 N.L.R.B. at 532 (retaining jurisdiction while dismissing complaint). Given these circumstances, there was no effective guidance to those officers responsible for exercising prosecutorial discretion under the Act. Comparing the numerous instances prior to 1977 in which the Board chose not to defer with those instances in which it elected to defer, I have been unable to discern any consistent majority rationale.

The year 1977 is significant because in that year the Board decided *General American Transportation Corp.*, 228 N.L.R.B. 808 (1977). The *General American* case, like *National Radio*, involved statutorily protected activities. The charging party, Perry Soape, Jr., complained that he was discharged for engaging in protected activities, including taking time off to attend area contract negotiations, and filing a complaint with the Occupational Safety and Health Administration. Soape declined to grieve and arbitrate his discharge and instead filed a charge with the regional office of the Board. A union representative advised him that it would not assist him un-less he dropped the charge and pursued contract grievance remedies. The General Counsel filed a complaint, and the employer sought deference to the contract remedy. In a significant decision, three Board members, Fanning, Jenkins and Chairman Murphy, held that deferral was not required. Members Fanning and Jenkins wrote that no public rights enumerated under the Act could be relegated to a privately selected tribunal. 228 N.L.R.B. at 808–09. Dissenting members Penello and Walther reiterated the Board's *National Radio Co.* position that any unfair labor practice charge could result in deferral to contract arbitration. *Id.* at 814–16. The critical vote was that of Chairman Murphy, who reassessed *Collyer* and its application to cases not within its original scope. She drew the distinction between conduct the legality of which turns on an interpretation of the contract and conduct which, aside from the contract provisions, interferes with statutorily protected rights. In the latter group of cases, she wrote, the Board will not defer since resolution of the dispute must turn on an interpretation of the Act, not the contract. *Id.* at 810–11. Recognizing that the purpose of the Act was the protection of the free flow of commerce through both collective bargaining and private contractual dispute resolution, she made the telling point that both policies depend ultimately upon assurance of "full freedom of association." *Id.* at 811–12, *citing Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279–80, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *see* 29 U.S.C. § 141 (purposes of Act). The public interest in vindicating this most fundamental right, she wrote, precluded deferral to contract remedies. 228 N.L.R.B. at 812; *see* Note, 1978 S.Ill.Univ.L.J. 98. She therefore held that *National Radio Co.* and all of its progeny were an "unwise extension of the *Collyer* deferral policy into an area in which the Board should retain its preeminence and should be reversed." 228 N.L.R.B. at 811.

Chairman Murphy elaborated on her position in *Roy Robinson, Inc.*, 228 N.L.R.B. 828 (1977), decided on the same day as *General American*. In *Roy Robinson* she joined

members Penello and Walther in dismissing a complaint and deferring to arbitration procedures not yet invoked. Her reasoning for deferral was that the facts presented a pure contract issue "particularly suited to the arbitral process although these issues may also give rise to a charge under [sections] 8(a)(5) or 8(b)(3) of the Act." *Id.* at 831. Relying on the reasoning in her *General American* concurrence, she identified violations of sections 8(a)(1), 8(a)(3), 8(b)(1)(A) and 8(b)(2) as inappropriate for deferral. *Id.* In a subsequent case, she further noted that although section 8(a)(5) charges are generally appropriate cases for arbitration, a case involving charges under several sections, only one of which is a section 8(a)(5) charge, should not be fragmented, but should be heard by the Board. *Texaco, Inc.*, 233 N.L.R.B. 375 (1977). It is worth noting that also in 1977 the Board, with members Penello and Walther dissenting, held that in any case involving a section 8(a)(4) charge the Board would not defer, even to a completed arbitral award under *Spielberg*, because protection against section 8(a)(4) violations is a duty of the Board alone. *Filmation Associates, Inc.*, 227 N.L.R.B. 1721, 1721–22 (1977).

Since 1977, the Board has deferred only twice to arbitration not yet resorted to. *See Croatian Fraternal Union of America*, 232 N.L.R.B. 1010 (1977) (upholding decision of administrative law judge to defer); *Roy Robinson, Inc.*, 228 N.L.R.B. 828 (1977) (holding administrative law judge erred in refusing to defer). Both of these cases involved charges of unilateral action under section 8(a)(5) and thus both involved pure contract questions that would be resolved without reaching the unfair labor practice issue. *See Croatian Fraternal Union of America*, 232 N.L.R.B. 1010 (1977) (employer's decision to subcontract work and ban employee telephone calls); *Roy Robinson, Inc.*, 228 N.L.R.B. 828 (1977) (employer's decision to close body shop of automobile dealership). In every other *Collyer*-type case, where the arbitration process had not been invoked prior to the filing of the charge, the Board has held that deferral was inappropriate. The Board has been especially reluctant to defer in cases involving charges of violation of section 7 rights,[10] and cases in which for some reason the union's interests might not be congruent with the employee's.[11]

Since 1977, in the *Spielberg* cases, in which arbitration has already resulted in an award, the results have been mixed.[12] Un-

---

10. *E.g., Melones Contractors*, 241 N.L.R.B. No. 3, 100 L.R.R.M. 1477 (1979); *Loomis Courier Serv.*, 235 N.L.R.B. 534 (1978), *enf. denied on other grounds*, 595 F.2d 491 (9th Cir. 1979); *C & H Tire Serv., Inc.*, 230 N.L.R.B. 1173 (1977); *North Eastern Okla. City Mfg. Co.*, 230 N.L.R.B. 135 (1977).

11. *E.g., United Parcel Serv.*, 228 N.L.R.B. 1060 (1977) (Penello & Walther, concurring); *cf. Helvetia Sugar Coop. Inc.*, 234 N.L.R.B. 638 (1978) (employees trying to decertify union and employer refusal to bargain); *Sioux Quality Packers*, 228 N.L.R.B. 1034 (1977) (Walther, concurring) (substantial delay of union in seeking arbitration makes refusal to defer appropriate).

The Board is also more likely to refuse to defer if it appears that the employer would refuse to adhere to any arbitral award. *See, e.g., Precision Anodizing & Plating, Inc.*, 244 N.L.R.B. No. 135, 102 L.R.R.M. 1399 (1979) (Truesdale, concurring) (employer's conduct so hostile to union and contract that arbitration probably would not resolve issue); *St. Joseph's Hosp.*, 233 N.L.R.B. 1116 (1977) (refusal of respondent to furnish information necessary for arbitration proceeding); *Texaco, Inc.*, 233 N.L.R.B. 375 (1977) (Murphy, Chairman, concurring) (employer unlikely to adhere to arbitral award); *cf. Los Angeles Marine Hardware Co.*, 235 N.L.R.B. 720 (1978) (Penello, concurring) (deferral not appropriate where employer repudiated collective bargaining agreement), *enf'd*, 602 F.2d 1302 (9th Cir. 1979).

12. *Compare Pacific Southwest Airlines, Inc.*, 242 N.L.R.B. No. 151, 101 L.R.R.M. 1366 (1979) (deferral under *Spielberg*) *and United States Postal Serv.*, 241 N.L.R.B. No. 192, 101 L.R.R.M. 1074 (1979) (defer to award where Board had originally deferred to process) *and Kansas City Star Co.*, 236 N.L.R.B. 866 (1978) (Murphy, Penello, and Truesdale adhering to *Spielberg* in general; Fanning and Jenkins concurring in result) *with Melones Contractors*, 241 N.L.R.B. No. 3, 100 L.R.R.M. 1477 (1979) (refusing to defer to award because § 8(a)(3) issue not reached in arbitration) *and Max Factor & Co.*, 239 N.L.R.B. No. 99, 100 L.R.R.M. 1023 (1978) (refusing to defer to post-hearing award because § 7 right not considered) *and Gould, Inc.*, 238 N.L.R.B. No.

til January of this year, the Board's application of the three part *Spielberg* test had resulted in Board deferral to awards even where it was not clear that the arbitrator had been presented with the unfair labor practice claim.[13] In January, the Board overruled its prior decision permitting that result and noted that although deferral might have been administratively economical, it was also "an impermissible delegation of the Board's exclusive jurisdiction under Section 10(a) of the Act." *Suburban Motor Freight, Inc.*, 247 N.L.R.B. No. 2, 103 L.R.R.M. 1113, 1114 (1980). The Board further noted that experience with that extended application of *Spielberg*, "promote[d] the statutory purpose of encouraging collective-bargaining relationships, but derogate[d] the equally important purpose of protecting employees in the exercise of their rights under Section 7 of the Act." *Id.* This latest decision of the Board may signal the Board's recognition that the line drawn in *General American* between pure contract questions and statutorily-protected rights issues should properly be applied not only to the *Collyer* cases, but to the *Spielberg* cases as well.

Two things are apparent to me from this analysis. First, the *General American* distinction between contract interpretation issues and statutory rights issues is a long

awaited indication of rationality in Board line drawing for the purpose of applying both *Spielberg* and *Collyer*. While I do not in this case have to resolve the remaining area of dispute between Chairman Murphy and Members Fanning and Jenkins,[14] I can appreciate the logic of Chairman's Murphy's *General American* position. Perhaps the Board should not interpret contracts when the parties have designated another interpreter.[15] But plainly the Board must interpret the Act, and decide what the public interest requires by way of sanction for violations of statutory rights. Second, the panel majority has chosen to reject the Board's current majority position, to embrace the overruled *National Radio Co.* position, and for all practical purposes to make the *National Radio Co.* deferral analysis mandatory rather than discretionary. Neither the Board nor any court has ever gone that far.

### III.

Thus far I have discussed the *Spielberg-Collyer* doctrine as it has developed in the Board, and have noted that this court has not yet addressed directly the issues it presents. I have also noted that *Carey v. Westinghouse Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1963), a case sometimes referred to as an approval of an across the

88, 99 L.R.R.M. 1705 (1978) (refusing to defer on application of *Spielberg* because unfair labor practice not considered in arbitration).

**13.** *See Electronic Reproduction Serv. Corp.*, 213 N.L.R.B. 758 (1974), *overruled, Suburban Motor Freight, Inc.*, 247 N.L.R.B. No. 2, 103 L.R.R.M. 1113, 1114 (1980).

**14.** Members Fanning and Jenkins would overrule *Collyer* as well, on the grounds that it does not ensure protection of statutory rights and results in added administrative costs because of the timing of the *Collyer* analysis. 228 N.L.R.B. at 810.

**15.** *See, e.g.*, St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at* Enterprise Wheel *and its Progeny*, 75 Mich.L. Rev. 1137 (1977). Commentators, however, have not reached any consensus on either the wisdom or benefits, if any, of the *Spielberg-Collyer* doctrine. *Compare* Covington, *Arbitrators and the Board: A Revised Relationship*, N.C.L. Rev. 91, 128–36 (1978) (favoring *Spielberg* de-

ferral; suggesting doctrine for accommodation) *and* Teple, *Deferral to Arbitration: Implications of NLRB Policy*, 29 Arb.J. 65 (1974) (generally favoring deferral) *and* Zimmer, *Wired For Collyer: Rationalizing NLRB and Arbitration Jurisdiction*, 48 Ind.L.J. 141 (1973) (generally favoring deferral; favoring *National Radio Co.* over *Collyer* approach) *and* Schatzki, *A Response to Professor Getman*, 49 Ind.L.J. 76 (1971) (responding to criticism of his favorable view of deferral) *with* Getman, *Collyer Insulated Wire: A Case of Misplaced Modesty*, 49 Ind.L.J. 55 (1973) (opposing deferral in general) *and* Getman, *A Little Bit More on Collyer Insulated Wire*, 49 Ind.L.J. 80 (1973) (responding to Professor Schatzki; noting deferral results in no increase in administrative efficiency) *and* Atelson, *Disciplinary Discharges, Arbitration and NLRB Deference*, 20 Buffalo L.Rev. 355 (1971) (opposing deferral; arguing excessive harm to individual cases outweighs any benefits).

board deferral policy, actually involved a jurisdictional-representational matter, as to which there are separate statutory provisions. This court has twice before addressed the *Spielberg-Collyer* policy of deferral, but neither of those opinions conflicts with the analysis that I propose. First, in *Radio Television Technical School, Inc. v. NLRB*, 488 F.2d 457 (3d Cir. 1973), we enforced the Board's order finding an unfair labor practice in spite of an arbitral decision to the contrary. We there noted that the Board's *Spielberg* policy was a voluntary one and that the refusal to defer was appropriate because the arbitrator's decision ignored a long line of Board and court precedent and thus was repugnant to the Act, which the Board was required to enforce. *Id.* at 460–61. The issue of whether a holiday bonus was a gift or was a part of one's wages was not one which could be resolved solely by reference to the contract and thus the Board's refusal to defer was appropriate. *See id.* at 461. Second, in *Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388 (3d Cir. 1974), we again upheld a refusal to defer,[16] there, to the process of arbitration rather than to an award. *Id.* at 395 n.9. We noted that the Board should not be required to defer as an abstract proposition because mandatory deferral would be undesirable. First, in some cases the parties might not choose to arbitrate and should not be forced to do so. Second, the deferral decision should not be made, we agreed, in the absence of full presentation of the facts appropriate to the deferral decision. *Id.* Therefore, prior decisions of this court militate against the broad mandatory deferral policy endorsed by this majority. Neither case, however, squarely presented this court with an opportunity to assess either the original propriety or the continued validity of the Board's *Spielberg-Collyer* deferral policy.

Looking to the other courts of appeals I do not receive much guidance. There are a fair number of cases in which the charged parties sought review of a Board order when the Board refused to defer. Until the majority opinion, in every instance but two, the charged party was unsuccessful in persuading a court of appeals that deferral should be ordered. *Compare, e.g., Alfred M. Lewis v. NLRB*, 587 F.2d 403, 407–08 (9th Cir. 1978) (upholding refusal to defer to process of arbitration on a contract issue) *and Hawaiian Hauling Serv., Inc. v. NLRB*, 545 F.2d 674, 675–76 (9th Cir. 1976) (upholding refusal to defer to arbitration award on statutory rights issue), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977) *and Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 330 (7th Cir. 1976) (upholding refusal to defer to arbitration award on statutory grounds) *and T.I.M.E.–DC, Inc. v. NLRB*, 504 F.2d 294, 302–03 (5th Cir. 1974) *and NLRB v. Brotherhood of Railway, Airline & Steamship Clerks*, 498 F.2d 1105, 1109–10 (5th Cir. 1974) (upholding refusal to defer to arbitration process on statutory rights issue) *and Office & Prof. Empl. Int'l Union, Local 425 v. NLRB*, 419 F.2d 314, 317–20 (D.C. Cir. 1969) (upholding refusal to defer to arbitration process on statutory issue) *with Douglas Aircraft Co. v. NLRB*, 609 F.2d 352, 355 (9th Cir. 1979) (denying enforcement of Board order on ground that Board should have deferred to arbitration award on statutory rights issue) *and Servair, Inc. v. NLRB*, 102 L.R.R.M. 2705, 2706–10 (9th Cir. Oct. 23, 1979) (denying enforcement of Board order on ground that Board should defer to arbitrator's award on contract or statutory issue), *petition for rehearing granted*, No. 78–2791 (9th Cir. 1980). In a number of these cases the courts refer to the *Spielberg-Collyer* doctrine and conclude that the Board did not commit an abuse of discretion in refusing to defer and in proceeding to adjudicate the General Counsel's charge. The discussion of the doctrine in such cases is not, however, particularly helpful to us because those courts had no occasion to analyze the source of a negative power when the Board had already acted affirmatively.

---

**16.** In *Food Fair*, the parties to the contract had not raised deferral as an affirmative defense, but the court addressed the *Collyer* issue briefly because it was raised in an *amicus curiae* brief.

Aside from those cases in which the courts of appeals have refused to order deferral, the *Spielberg-Collyer* doctrine has been before those courts in several cases in which the charging party has objected to deference. An early approval of the doctrine is found in Judge Hays' opinion in *Nabisco, Inc. v. NLRB*, 479 F.2d 770 (2d Cir. 1973). That opinion does not discuss the respective roles of the Board and the General Counsel. The case involved, however, an employer who charged the union with a unilateral change of contract in violation of section 8(b)(3), and the case therefore turned solely on the meaning of the contract. *Id.* at 772–73. *Nabisco* was deemed controlling in the Second Circuit in *Local 700, Int'l Ass'n of Machinists & Aero. Wkrs. v. NLRB*, 525 F.2d 237, 239 (2d Cir. 1975). In that case the court approved the Board's decision to defer even on charges of anti-union harassment. But while the court refused to overrule the Board's deferral decision it noted

> [t]hat does not mean that if an arbitrator finds an unfair labor practice to have been committed, the Board may not impose further remedies available to it under the Act. The Board can and should fashion its own remedies, notwithstanding an arbitration award, in cases where it determines, in its discretion, that such remedies are appropriate, to carry out its statutory mandate to correct unfair labor practices.

*Id.* at 246. As a member of the Second Circuit panel in the *Local 700* case, I felt bound by the *Nabisco, Inc.* precedent. Since then, however, I have come to recognize that contract interpretation issues and statutory rights issues present quite different policy considerations and that therefore *Nabisco, Inc.* was not controlling.

The District of Columbia Circuit has also considered objections to deference by the charging party. The first consideration of such objections by that court was in *Associated Press v. NLRB*, 160 U.S.App.D.C. 396, 492 F.2d 662 (D.C.Cir.1974). Writing for the court, Judge Wright relied upon Judge Hays' *Nabisco, Inc.* opinion, 492 F.2d at 668 n.24, without explicitly recognizing that *As-*

*sociated Press* involved both a contract interpretation dispute, which is the only issue with which the *Nabisco* court dealt, and a dispute over employees' statutory rights to terminate dues checkoff authorizations. *See* 29 U.S.C. § 186(c)(4). But the court also noted that the effectiveness of attempted dues revocations was dispositive of the contractual unfair labor practice charges. 492 F.2d at 666. Thus the statutory rights issue as to which deferral was approved was intimately related to the contract issue. Even so, it is at least questionable whether the current Board majority would defer to arbitration on the question whether authorizations for dues checkoffs had been terminated in accordance with the statute. As in *Nabisco, Inc.*, the District of Columbia Circuit did not discuss the separate role of the General Counsel. The *Associated Press* case was followed in *Local 2188, IBEW v. NLRB (Western Electric)*, 161 U.S.App.D.C. 168, 494 F.2d 1087, 1090 n.2 (D.C.Cir.1974), and *Local 715, IBEW v. NLRB (Malrite of Wisconsin)*, 161 U.S.App. D.C. 217, 494 F.2d 1136, 1137 (D.C.Cir. 1974), both involving charges of unilateral actions allegedly in breach of the contracts. The *Malrite* case, however, introduced what was the beginning of a refinement of the approach taken in *Spielberg-Collyer* cases by the District of Columbia Circuit. In *Malrite*, while approving deferral on a contract issue decided by the arbitrator, the court rejected the Board's decision to defer with respect to charges respecting events which took place after the arbitration hearing. 494 F.2d at 1139. Subsequently, in *Banyard v. NLRB*, 164 U.S.App.D.C. 235, 505 F.2d 342 (D.C.Cir.1974), the District of Columbia Circuit discussed the three *Spielberg* criteria, and then held that

> [t]o the three prerequisites of *Spielberg* already listed in *Local Union 715* [Malrite] . . . we would add that the *Spielberg* doctrine only applies if the arbitral tribunal (A) clearly decides the issue on which it is later urged that the Board should give deference, and (B) the arbitral tribunal decided an issue within its competence.

*Id.* at 347. The dispute in *Banyard* arose out of concerted activity protesting abnormally dangerous working conditions, protests arguably protected by section 7, 29 U.S.C. § 157 and section 502, 29 U.S.C. § 143. Noting the difference between contract rights and statutory rights the court observed

> [o]ur approval of the Board's deferral under *Spielberg* of statutory issues to arbitral resolution along with contractual issues is conditioned upon the resolution by the arbitral tribunal of *congruent* statutory and contractual issues. In that situation "the arbitration award becomes the sole remedy for both contractual and statutory violations." If in the present case the Joint Committee applied to the issue before it a standard correct under the contract but not under judicial interpretation of section 502, then it cannot be said that the statutory issue was decided by the Joint Committee. In that event the Board's abstention goes beyond deferral and approaches abdication.

505 F.2d at 348, *quoting Local 715, IBEW v. NLRB*, 494 F.2d at 1138. The court remanded to the Board with a direction to decide the charges rather than defer. Thus the present position of the District of Columbia Circuit appears to be that it will approve deferral on statutory rights issues only if there is an exact congruence between contractual rights and statutory rights. Whether, in view of the *General American* majority position, the Board would go even this far is a matter of speculation. But clearly the District of Columbia is far indeed from the position of the majority in this case, that deferral on non-congruent statutory rights issues is not only authorized but required.

Other circuit courts have addressed the *Spielberg-Collyer* issue. The Tenth Circuit, in a very early decision, approved the *Spielberg* test as a valid exercise of the Board's discretion without analysis of the proper roles of the Board and the General Counsel. *NLRB v. Auburn Rubber Co.*, 384 F.2d 1, 3 (10th Cir. 1967). Reviewing the Board's refusal to defer to the award in circum-

stances involving both section 8 and section 9 issues, the court held that refusal to defer to a section 8(a)(1) award was an abuse of discretion because it was raised before the Board by an unaffected third party. As to the section 8(a)(3) award, the court affirmed the Board's refusal to defer because the union was antagonistic to the affected employees, who therefore preferred to have their rights determined by the Board. *Id.* at 3–4. In *Dreis & Krump Manufacturing Co.*, 544 F.2d 320 (7th Cir. 1976), the Seventh Circuit approved the *Spielberg* policy, also without analysis, but rejected petitioner's argument that *Spielberg* deferral was mandated, relying on the Board's non-delegable duty under section 10(a). The court therefore upheld the Board's refusal to defer to an award that would have permitted violation of the employee's section 7 rights. *Id.* at 330. In *Enterprise Publishing Co. v. NLRB*, 493 F.2d 1024 (1st Cir. 1974), the First Circuit rejected an employer's challenge to a Board deferral decision on a statutory dues checkoff dispute which, as in the *Associated Press* case, was closely related to a contract dispute. The First Circuit opinion relied on *Associated Press, id.* at 1027 n.1, approved *Collyer* in a conclusory manner, and addressed none of the issues discussed herein. The Ninth Circuit's initial rejection of a challenge to *Spielberg-Collyer* was even more cryptic; that court issued a two paragraph per curiam opinion citing *Nabisco, Inc. v. NLRB. See Provision House Wkrs. Union Local 247 v. NLRB*, 493 F.2d 1249 (9th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). Since then the Ninth Circuit has not pursued any consistent policy. In *Stephenson v. NLRB*, 550 F.2d 535 (9th Cir. 1977), it noted and adopted the refinements added to the review equation by the District of Columbia Circuit, and referred the case to the Board for decision on the merits. *Id.* at 538. In *Servair, Inc. v. NLRB*, 102 L.R.R.M. 2705 (9th Cir. Oct. 23, 1979), *petition for rehearing granted,* No. 78–2791 (9th Cir. 1980), purporting to distinguish *Stephenson*, in a case dealing with alleged discriminatory discharges, the court noted that

[i]f an arbiter, with the agreement of the parties, resolves an issue completely, that decision should not be disregarded simply because the issue is capable of being perceived as a statutory question. Only when the arbiter has not resolved an ambiguous issue should that issue be capable of being raised anew before the Board as a statutory violation.

*Id.* at 2709. In *Douglas Aircraft Co. v. NLRB*, 609 F.2d 352 (9th Cir. 1979), the Ninth Circuit went further, holding that the Board should have deferred to an ambiguous arbitration award "because a plausible interpretation of the . . . award was consistent with the Act." *Id.* at 355. Thus, *Douglas Aircraft* and *Servair* are the only two cases ever to do what the majority proposes to do, to reverse a decision by the Board not to defer. With deference, I think both the Ninth Circuit and the majority have stood the Act on its head. Even in the days when the Board gave *Spielberg-Collyer* its broadest reading, that tribunal never completely abdicated its responsibility to decide what remedy is required in the public interest when violations of statutory rights have occurred. The District of Columbia Court of Appeals in *Banyard* held that it will tolerate deference to arbitration only where there is congruence between the contract and statutory issues. The Second Circuit in *Local 700* recognized that even in cases of deference the Board reserves the right to reconsider the scope of the remedy. The Seventh Circuit in *Dreis & Krump* refused to order deferral where section 7 rights were involved. But the Ninth Circuit, in *Servair*, a case dealing not with contract rights but with discharges alleged to have been the result of an attempted domination or interference with the formation or administration of a union, proscribed by section 8(a)(2) or to have been discriminatory in violation of section 8(a)(3), held that if an arbitration has taken place the Board may not entertain a charge. That same court, in *Douglas*, required deference to an arbitrator's decision that an employee's discharge was not in violation of his section 7 rights. 609 F.2d at 355. The arbitrator's resolution of a private contract dispute, under the Ninth Circuit's analysis, therefore becomes dispositive of the public interest. The majority's standard of review, requiring deference whenever the arbitrator's decision is "arguably correct" is perhaps less rigid than that of the *Servair-Douglas* court, which may require deference whether the award is correct or not. Neither test, however, takes into account the fact that more is at stake in the resolution of unfair labor practice charges than the rights of private parties. We ought not permit deference to an arbitration resulting in an interpretation of a contract that is illegal. If, for example, the union forced the employer to accept a hot cargo clause, illegal under section 8(e), or a clause restricting subcontracting and thereby amounting to an antitrust violation, *see Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 623–26, 95 S.Ct. 1830, 1835–36, 44 L.Ed.2d 418 (1975); *cf. Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494, 511–19 (3d Cir. 1979), an arbitration award which gave effect to such a contract could not be enforced by the Board or the courts, even though it could be fairly characterized as a contractual issue. In the face of the emerging trend in the decisions of the Board and the District of Columbia Circuit cutting back on the deferral policy and the trend in the Ninth Circuit expanding the cases in which deferral will be mandated, we, who have not yet spoken on the deferral issue, should carefully analyze the purposes of the Act and the role of the General Counsel before taking sides.

IV.

Outside the section 10(k) area, where the statute authorizes it, I have grave doubts about the power of the Board to review the charging decision of the General Counsel in an unfair labor practice case. Moreover, the *Spielberg-Collyer* doctrine, even as a possible interpretation of the Act, is an undesirable one if for no other reason than the administrative law nightmare it has spawned. But if such power is to be recognized it should at least be confined, as the

Board majority now confines it, to section 8(a)(5) and section 8(b)(3) cases involving contract interpretation matters in which the interpretation of the contract by the agreed upon method in effect eliminates the predicate for the charge. I do not share the majority's eloquent enthusiasm for contract arbitration as a means for protecting statutory rights of minority members. In the first place, with no congruence of interest between the majority and minorities in a bargaining unit, the provisions of the contract will usually, if not inevitably, reflect majority concerns. Second, the typical contract places control of the grievance-arbitration mechanism in the practical control of the union or the employer, again to the detriment of the protection of minority rights. Finally, judicial review of arbitration awards, as contrasted with Board decisions, is so narrow as to amount almost to no review. *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969). By virtue of the panel majority's extreme views on *Spielberg-Collyer* deferral, expressions of the minority's viewpoint will in the future receive little if any protection from the judiciary. We should not approve deferral on charges involving interference with non-contractual statutory rights. We should never permit the Board to abdicate to a privately selected tribunal the decision on questions of law with respect to those rights. We should at least insist that in all instances the Board has the power to determine whether, a statutory violation having occurred, the public interest demands greater relief than that which the arbitrator has afforded. Above all, we should not substitute our judgment for that of both the General Counsel and the Board by insisting on deference to contract arbitration when neither considers deference to be in the public interest.

### V.

On the facts of this case, then, where the administrative law judge found that Richardson was engaging in the protected activity of leafletting, and where arguably the union was less than enthusiastic about protecting her rights in the arbitration proceeding because it appears that she was attempting to organize a rump group in opposition to the union, this court should not force the Board to defer. Mandatory deferral here would force the Board to abdicate its statutory duty to protect employees in the exercise of their section 7 rights and would impermissibly negate the prosecutorial discretion vested in the General Counsel under the statute.

On the merits, the Board's decision that a discharge occurred because Richardson engaged in protected activity is supported by substantial evidence in the record as a whole. I do not understand the majority to suggest otherwise, although they probably view the employer's case more favorably than I do. I would enforce the Board's order.

